THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES S. SIMMONS, Plaintiff in Error.

*Opinion filed October 24, 1916.*

1. CRIMINAL LAW—*when evidence is conflicting, prejudicial error should be carefully avoided.* Where the evidence is so contradictory as to make the determination of the facts a matter of great difficulty, care should be taken in the conduct of the trial to avoid error which will prejudice the defendant in the presentation of his defense and its consideration by the jury.

2. SAME—*what remark by the court in regard to a witness contradicting himself on the second trial is prejudicial.* Where a witness on a second trial contradicts the testimony he gave on the first trial and makes an affidavit that his testimony on the first trial was not the truth it should be left to the jury which testimony to believe, and it is error for the court, referring to the witness, to say that all the evidence given at the various times when he had testified wound up and culminated in this perjury, the effect of which was to tell the jury that the testimony reached its final effect in the perjury committed on the trial.

3. SAME—*when evidence to show the motive for changing testimony should be admitted.* Where a witness on the second trial contradicts the testimony he gave against the defendant on the former trial the court should permit the defendant to show the motive which induced the witness to change his testimony, and it is competent to prove that such change arose from remorse, awakened conscience or fear of the vengeance of God.

4. SAME—*prosecution cannot use witnesses solely to show perjury in procuring a new trial.* The prosecution should not be allowed to call and examine witnesses for the sole purpose of showing the jury that perjury was committed by them in procuring a new trial for the defendant even though the defendant does not object, but the defendant cannot take advantage of the error without objecting.

5. SAME—*what evidence of other transactions is not admissible.* Evidence of other occurrences, the whole tendency of which is to call the attention of the jury unfairly to other acts of alleged misconduct on the part of the defendant than those in the case on trial, is not admissible.

6. SAME—*when evidence of assault on deceased's wife just before the homicide is not admissible.* In a murder trial, evidence of an assault said to have been committed on the deceased's wife by the mother and sister of the defendant in the morning of the day

of the homicide and in the absence both of the deceased and the defendant is not admissible where there is no testimony that the defendant knew anything about it.

7. SAME—*condition of defendant after alleged fight is competent evidence.* Where there is testimony tending to show that the defendant on trial for murder was injured during a fight with the deceased and others, during which he claims he was beaten with a small hatchet or hammer and a club, it is competent to show his physical condition when he was arrested immediately after the fight, even though there is testimony tending to show he might have been injured afterward.

8. SAME—*what instruction is erroneous as ignoring defendant's right of defense of family.* An instruction telling the jury that if the defendant, with malice aforethought, made the assault as charged in the indictment they should find him guilty is erroneous, where it ignores the right of the defendant, under the facts in evidence, to defend his mother and sister against an alleged unlawful assault, even though it recognizes his right to defend himself.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

O'HARA & O'HARA, SCOTT & JAFFIE, and RICHARD H. COLBY, for plaintiff in error.

P. J. LUCEY, Attorney General, and MACLAY HOYNE, State's Attorney, (EDWARD E. WILSON, and DWIGHT MC-KAY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error shot and killed Hyman Jacobs on November 10, 1912. He was indicted for murder and at the August term, 1915, of the criminal court of Cook county was convicted of manslaughter, a similar verdict rendered at a former trial having been set aside.

The homicide occurred on a Sunday afternoon at 3508 West Twelfth place, in the city of Chicago. These premises were occupied by a flat-building owned by the deceased, who with his family lived on the first floor. The flat immediately above was occupied by the Simmons family, con-

274 — 34

sisting of defendant, who was an unmarried man thirty-two years old, his mother, who had been a widow for twenty-one years, his two brothers and a sister. The Simmons family had lived there about a year; the deceased since the preceding April, when he bought the building. Between this and the next building west was a paved court-way about ten feet wide, into which a stairway led from the porch back of the flat occupied by the deceased and from which a short flight of steps led to the basement. There was also a stairway from the porch back of the Simmons flat to the first-floor porch back of the deceased's flat. It was at the foot of this stairs that the shooting occurred. The defendant fired three shots, the last of which struck the deceased in the right leg, cutting the femoral artery, and death followed from the resulting hemorrhage.

On the part of the prosecution it was contended that about four o'clock in the afternoon the deceased, together with his wife and Benjamin Levy, was in the court-way, and the deceased was complaining to Levy of the treatment of his wife by the Simmons' when he was away from home and of an assault made on her that morning by Mrs. Simmons and her daughter; that the defendant, his mother and sister, standing upon the stairway leading down from their flat, heard what was said, and that the defendant's sister said, "We will kill them all." The deceased said that "he did not want to speak to her but to that gentleman," pointing to Simmons, who thereupon came down with a revolver in his hand and started to shoot, though Jacobs and Levy were asking him not to shoot. Miss Simmons followed her brother down with a policeman's club, and Mrs. Simmons also followed him and joined in the affray. On the part of the defendant evidence was introduced to show that shortly before the shooting Mrs. Simmons left her flat intending to go to the grocery, and when she got to the foot of the stairs the deceased, his wife, their two daughters and others assaulted and kicked her, tore her hair

and threw her into the basement, dislocating her left arm and otherwise injuring her. She screamed, and her daughter came down and called for help to the defendant, who was in the flat, shaving. He took his revolver and started down-stairs. His mother was crawling out of the basement and the crowd were attacking her and his sister. Hyman and Nathan Jacobs assaulted the defendant and Levy hit him with a baseball bat. He tried to get away and called to them to stop hitting him, but they continued the assault, and thereupon to protect himself and his mother and sister he shot. There were present during all or a part of the affray, Hyman Jacobs, the deceased, his wife, his son, Nathan, his two daughters, Benjamin Levy, his wife, his daughter, Mamie, Bertha Gordon, Anna Brownstein, Charles G. Vetten, a policeman, and others. Nathan Jacobs was not examined. The wife and daughters of the deceased, Charles G. Vetten, the policeman, and Bertha Gordon, testified corroborating the version of the facts as claimed by the prosecution. The defendant, his mother and sister, the three Levys and Anna Brownstein testified corroborating the defendant's version of the facts.

From this statement it is manifest that the evidence was so contradictory as to make the determination of the facts a matter of great difficulty and to require care in the conduct of the trial to avoid error which would prejudice the defendant in the presentation of his defense and its consideration by the jury. Such care does not appear to have been exercised. The record is rather extraordinary in the things shown to have been done and omitted.

Benjamin Levy, Esther Levy, his wife, and their sixteen-year-old daughter, Mamie Levy, were eye-witnesses to the homicide. All testified before the coroner's inquest, Mrs. Levy and the daughter testified before the grand jury, all three testified at the first trial of this case, and on these occasions their testimony corroborated the claim of the prosecution as to the occurrence. After the verdict in

the first trial all three made affidavits contradicting their previous testimony and stating facts tending to sustain the defendant's side of the controversy. All three were indicted for perjury in making these affidavits. On this trial the State's attorney, after having introduced other testimony for the prosecution, stated that he did not wish to vouch for the veracity of Benjamin Levy and asked the court to call him for testimony as to certain matters. The court, after asking the defendant's counsel if they agreed that the witness might come as an eye-witness, ordered the witness brought in and directed the State's attorney to question him. The State's attorney then asked him if he had been indicted for perjury committed on motion for a new trial of this defendant. No objection was made to the question. The witness answered that he had made an affidavit that the testimony he gave before Judge Kersten was not the truth. The State's attorney then proceeded to ask the witness if he had testified to certain things on the first trial. No objection was made and the witness answered that he did testify to those things. Afterward the State's attorney proposed to read the witness' testimony before the coroner's jury and asked the defendant's counsel if they would admit what the witness' testimony was before the coroner's jury, and counsel answered, "We will admit he did testify that way." The State's attorney then read the transcript of the witness' testimony before the coroner's jury. In the same way his testimony on the first trial of the case was read. The State's attorney asked no question in regard to the occurrences at the time of the homicide, but having read his previous testimony withdrew the witness. The same course was pursued in regard to Mrs. Levy and Mamie Levy. None of this testimony, of course, was competent for the prosecution in chief, but it was not objected to. Afterward these three witnesses were recalled and interrogated further by counsel for the defendant. After having shown by Benjamin Levy his presence at the time of the homicide,

defendant's counsel read certain of his testimony given at the coroner's inquest and asked him whether that testimony was true. The State's attorney objected on the ground that the testimony could not be impeached by a perjurer; that it was given under oath, and under the law the witness could not impeach it. That objection was sustained. Similar rulings were subsequently made during the examination of the witness. The State's attorney, in referring to these witnesses, usually referred to them as perjurers, and the defendant's counsel excepted to his doing so. The court made no ruling in the matter, but did not correct the State's attorney or intimate that this course was not entirely proper. Thereupon the defendant's counsel examined the witness as to the events which occurred at the time of the homicide, and he gave an account of the occurrence which contradicted his previous testimony and tended to sustain the defendant's claim in regard to the facts. Defendant's counsel then asked the witness how he came to change his story. The State's attorney objected to the question as immaterial, and the court stated: "We cannot allow you to do that; all we are here for is the truth." The defendant's counsel sought to have the court change his ruling, closing with the statement that since the previous trial the witness had changed his testimony, and with the questions, "Haven't we a right to show how he came to change it, and then it be competent for the State to ask him whether he was paid or was promised anything or be lying now? Haven't we a right to get before the jury the entire truth?" The court's ruling was contained in the following statement: "But he has detailed now all this evidence that wound up and culminated in this perjury, and he is my witness. I called him because you wanted me to. I have some rights here, and I say I have used this witness just as far as I am going to. So far as your questions are concerned, they are supposed to be the court's questions, and the court objects to them and will not allow

you to ask them with relation to what made him change his evidence." The defendant offered to show by the witness that after the verdict on the first trial remorse came to the witness, and that he finally reached the conclusion to tell the truth but was prevailed upon not to do so; that shortly afterward one of his children died; that he then felt that God had punished him and his wife and daughter for the perjury they had committed; that about the same time two of the other children became ill, and then, feeling that God might save the lives of the other children, who were still alive though very sick, in order to make his peace with God he made up his mind to change his story. But the court sustained the objection, saying: "It is not proper to go in the record. It is a most self-serving thing. He is excusing himself for perjury. He will do that when he gets on trial under that indictment, if he can. That is the time. I am not trying him for perjury."

Substantially the same thing occurred in regard to the testimony of the other two witnesses. Perjury was committed by these witnesses in one or the other statement. The first statement cleared Benjamin Levy of any participation in the difficulty. The second statement (his testimony on the present trial) shows him to have been a participant in the assault upon Simmons. It was for the jury to determine which statement, if either, was true, and the defendant had the right to have this question submitted to the jury uninfluenced by the expression of any opinion by the court. It was not proper for the court, referring to the witness, to say that all the evidence given at the various times when he had testified wound up and culminated in this perjury. This was to tell the jury that the testimony reached its final effect in the perjury committed on the trial. It may be, as a matter of fact, that the jury would have reached the conclusion that the testimony of the witness given on this trial was perjury, but the defendant had the right to have the judgment of the jury on that question,

uninfluenced by the court. It might be that the jury would
not believe that the witnesses' change of testimony arose
from a change of heart caused by remorse of conscience
or fear of the vengeance of God, but it might be precisely
the reverse. The witnesses were there present in court.
The jury could see them and hear them testify. The evi-
dence may or may not have been convincing, but it was
the defendant's right to have it heard. The question of
motive was material. If the witnesses had been hired to
give false testimony in the first place, or if they had been
hired to give false testimony on the second trial, probably
no one would insist that the fact of hiring was not a proper
thing to show or that it ought not to influence the credit
to be given to the witnesses' testimony. Some people are
influenced by conscience. Some are afraid of what they
believe to be the wrath of God. Remorse is a powerful
motive. Whether one actually feels remorse, whether he is
influenced by the stings of awakened conscience, whether he
is influenced by the fear of the wrath of Deity offended,
may be difficult of proof, but if such matters are of import-
ance then the party interested in proving them is entitled
to produce the only evidence which can be produced of
their existence.

The State's attorney did not desire to use the three
Levys as witnesses to the homicide on this trial. He simply
desired to produce them to show the jury that perjury had
been committed in procuring a new trial. He asked them
not a single question about the subject matter of the in-
dictment. The court ought not to have permitted the wit-
nesses to be called for any such purpose. Even though the
defendant does not object, the rules which prevail in a town
meeting ought not to be permitted to be introduced into
trials in a court of law. Since the defendant did not ob-
ject, however, he is not in a position to take advantage of
the error, but he is entitled to avail of the error of the
court in refusing to permit him to show the motive which

induced these witnesses to change their testimony and in characterizing their evidence as perjury.

In the cross-examination of the defendant as a witness he was asked and required, over objection, to answer the question if he was arrested for having a gun and tried before Judge Eberhardt and officer Carney arrested him and he was fined $25 for having a revolver. He answered he was not arrested and did not have any gun, and the question was then asked, "Did you say on no occasion you were fined for carrying a gun?" and over objection he was required to answer, and did answer, "Not to my recollection." No evidence was introduced, and, of course, none would have been proper, contradicting this denial, but it must be assumed that the prosecuting attorney knew that the questions were incompetent and that he had no right to ask them, and that they were only asked for the purpose of making the jury believe that the defendant was a lawless person,—was in the habit of carrying a gun and had been fined for it. Over objection the court also required him to answer questions in regard to the supposed occasion of a family fight in his house when a patrol wagon was called, a police officer came and the defendant tried to throw him out. The defendant denied such an occurrence, and in spite of its immateriality the court, over objection, again permitted witnesses to be called in rebuttal to testify that the patrol wagon was called to the defendant's house about six months prior to the homicide; that the defendant and his brothers and mother were there; that the officers went in and had an argument with them and they wanted to put the officers out; that there was quite a little noise and evidence of a fight. It is difficult to see why the State's attorney offered, or the court permitted, evidence of these occurrences, which were entirely immaterial. Their only tendency was to call the attention of the jury unfairly to other acts of alleged misconduct on the part of the defendant than those in the case on trial.

Evidence was introduced by the People of an assault said to have been committed on Mrs. Jacobs in the morning of the day of the homicide in the absence both of Jacobs and the defendant.  There was no testimony that the · defendant knew anything about it and the evidence was not competent.

The court refused to permit evidence which was offered of the nature and extent of certain injuries from which the defendant was suffering after the shooting and after his arrest.  He was arrested immediately after firing the last shot, and there was testimony tending to show that he was injured during the fight, as well as other testimony tending to show that he might have been injured afterward.  The defendant claimed that he had been beaten with a small hatchet or hammer and a club during the fight, and his condition immediately afterward was competent to be given in evidence.  The defendant should have been permitted to testify whether he intended, in firing the shots, to kill or hurt any person.

The first instruction given on behalf of the People told the jury that if the defendant with malice aforethought made the assault as charged in the indictment,—not in self-defense as defined in the instruction,—the jury should find him guilty.  This instruction ignored the right of the defendant to defend his mother and sister against the unlawful assault and was therefore erroneous.

Other errors appear in the record which ought not to occur on another trial, and it is therefore unnecessary to discuss them.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*