(No. 34895.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH KIRKWOOD, Plaintiff in Error.

*Opinion filed May 22, 1959—Rehearing denied September 22, 1959.*

24

SCHAEFER and KLINGBIEL, JJ., dissenting.

EDMUND H. GRANT, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH and WILLIAM H. SOUTH, Assistant Attorneys General, and FRANCIS X. RILEY and WILLIAM L. CARLIN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

In 1951 Joseph Kirkwood was indicted in the criminal court of Cook County for the crime of forcible rape. Upon trial by jury he was found guilty and punishment was set at life imprisonment. His petition for a writ of error under Rule 65—1 and his petition for a writ of error under the Post-Conviction Hearing Act were allowed and have been consolidated. We have appointed counsel to represent defendant in this court.

The post-conviction petition which was filed in the trial court charged that certain evidence was improperly admitted and also alleged that defendant's counsel was incompetent. The petition was denied without a hearing and defendant contends on the post-conviction writ of error that the trial court erred in denying a hearing. The alleged errors in rulings on evidence did not present an issue requiring a hearing. Defendant was represented at his trial by counsel of his own choice and the trial judge in the post-conviction proceeding was correct in his ruling that defendant's allegation that his counsel was incompetent was insufficient to require a hearing. The judgment of the trial court in the post-conviction proceeding is therefore affirmed.

On the writ of error under Rule 65—1, it is urged that the defendant did not receive a fair trial because of errors in the admission and exclusion of evidence and because of improper cross-examination of defendant.

The record shows that on the evening of March 28, 1951, the prosecutrix, a 21-year-old married woman with two young children, was in her Chicago apartment watching television with her two-year-old daughter. Her husband, a long distance truck driver, had left the day before for Seattle, Washington, on one of his trips. The apartment, situated on the ground floor of premises at 116 South California Avenue, contained three front windows about six feet above the sidewalk, forming a bay in the living room.

One of the window shades was off the roller, and at the time in question a burning light in the hall provided some illumination in the living room. All windows were closed and locked except one in the bedroom and one in the bathroom, each of which was open about two inches. These windows faced a gangway between the apartment of complaining witness and the house next door. That area was dark and unlighted.

At midnight, after the close of the television program, the prosecutrix fed her daughter a night time snack in the kitchen and took her into the bathroom to give her a bath. The mother was dressed only in a robe, a slip and underpants. About ten minutes after the television program had ended she heard a noise in the hallway, but upon investigating she saw nothing. She finished bathing her daughter and was in the act of dressing her when she heard footsteps in the small hall connecting the bathroom to the larger hall toward the front of the building. She called out "Who is it," and upon realizing no one else should be in the apartment she started to close the bathroom door. Before she could completely close it, however, a negro pushed it open, entered the bathroom and shut the door behind him. She screamed, and the man put a knife to her neck, threatening to kill her unless she stopped the screaming. She asked if he wanted money to which he replied "No, I don't want money. I want you."

She picked up her daughter, who had continued to scream, whereupon the man put his arm around her neck and told her to make the child stop screaming or he would kill her. The little girl kept screaming, and the prosecuting witness asked to be allowed to put her to bed to stop her crying. The man opened the bathroom door, turned out the light, and followed her into the hall. He turned out the hall light, and when prosecutrix started for the front door he pulled her into the bedroom where he threw her, with the child still in her arms, upon the bed. Keeping his

coat and hat on and the knife in his hand, he forced her to have intercourse with him.

While in the act she heard a soft knock on the front door, followed by a loud one, and she yelled "There's somebody at the door." The man jumped up; and she managed to leave the bed, carrying the daughter in her arms, and ran to the door. She opened it, fell into the arms of Charles Rentfro, a tenant of the apartment above hers, and warned him not to enter because the man had a knife. Rentfro and his wife had been attracted to prosecutrix's apartment by the child's screaming, and after the complaining witness had made her escape Mrs. Rentfro called the police.

After accompanying the police in an investigation of the neighborhood, prosecutrix was taken to a hospital. She had about a three-inch scratch on her neck. Later she went to the police station, where her statement of the occurrence and her description of the assailant were taken. She viewed the line-up at the station on the evening of the attack, and on the following day looked at a large number of pictures at the identification bureau. In a book labeled "Known Sex Offenders" she found the picture of defendant, whom she identified as the one who had perpetrated the offense. On March 31, she viewed another line-up including nine colored men, one of whom she immediately recognized as her assailant. It was the defendant whom she pointed out.

At the apartment, in the meantime, it was found that the bedroom window was raised about half way, the bed was in disorder and the sheet had wet spots on it. On April 4 a police officer took prosecutrix home from her sister's apartment, to which she had gone after the attack, and recovered the sheet. Defendant's hat had been recovered from the cleaning establishment to which he said he had taken it. At the time of his arrest on March 31, defendant was wearing a maroon sport shirt and dark trousers. A dark overcoat was found in his room. These

items resembled the description which had been given to the police by the complaining witness. She had also told them that her assailant was about 25 to 30 years old, about six feet tall, weighed about 175 pounds, had dark brown skin and wore a thin moustache. Although we have been unable to find any reference in the briefs to a description of the defendant at the trial which corresponds, or fails to correspond, with these particulars, the complaining witness identified him in court as her assailant. Laboratory examinations of defendant's coat disclosed seminal stains, human hair from the head and pubic regions, and down feathers similar to those removed from the bed sheet.

On his own behalf the defendant testified he was never in the prosecutrix's apartment and did not commit the offense charged. He explained that on March 28 he returned home about 11:30 from the trade school he was attending, went to bed and did not leave his residence that night. Lillie Scott, a woman with whom he was living as man and wife, corroborated this.

In rebuttal, Ethel Lowthorp, who lived at 2840 West Fifth Avenue, about two blocks away from complaining witness's apartment, testified that she was accosted by defendant as she was entering her apartment about 4:45 A.M. on January 28. Olive Barkley, who resided at the same address, had a similar experience at the hands of defendant on February 14, about the same hour of the morning. Defendant's counsel objected to Mrs. Lowthorp's testimony that defendant "grabbed" her and this statement was stricken. No objection was made to the rest of her testimony and there was no objection to any portion of Mrs. Barkley's testimony. Although the testimony that defendant "grabbed" Mrs. Lowthorp was stricken, defendant's counsel went into this subject on cross-examination of Mrs. Lowthorp and elicited further details of the assault.

With this summary of the evidence before us, we shall proceed to a discussion of the specific errors assigned by

defendant. It is contended that the trial court improperly permitted the prosecutor to inquire into irrelevant and prejudicial matters on cross-examination of the defendant. Prior to defendant's testimony, Lillie Scott had testified for the defense that she and defendant lived together and that she regarded him as her "boy friend." She testified that on the night in question, defendant came home about 11:30 P.M. and went to bed with her, remaining in bed until the following morning. Defendant told the same story. On cross-examination it was brought out that defendant was married to another woman but had been separated from her for about five years. He was asked where he lived before he lived with Lillie Scott and he answered, without objection, that he lived at a certain address with one Edwynna Adams. Defendant contends that the evidence as to whom he was living with before he lived with Lillie Scott was immaterial and was prejudicial in that it tended to show that he was guilty of adultery. While the State was entitled to a reasonable latitude in the cross-examination of defendant, we are of the opinion that it was error to permit cross-examination as to whom defendant lived with several months before the date of the offense. However, defendant did not object to these questions and therefore cannot assign error thereon. (*People* v. *Trefonas,* 9 Ill.2d 92; *People* v. *Prohaska,* 8 Ill.2d 579.) Furthermore, in view of the testimony of Lillie Scott and defendant that they were living together as man and wife, we are unable to perceive how defendant could be prejudiced by evidence that he once lived with another woman without benefit of clergy.

On cross-examination, the defendant was asked whether he had ever been in the vicinity of 116 South California Avenue, where the prosecuting witness lived. When he said that he had not, he was asked whether he had ever been at 2840 West Fifth Avenue at any time and particularly on January 28, 1951, and February 14, 1951. He

replied, over objection, that he had never been there. In rebuttal, Mrs. Lowthorp and Mrs. Barkley testified as set forth above. It is contended that the cross-examination of defendant was improper and also that it was error to permit Mrs. Lowthorp and Mrs. Barkley to testify that they had seen defendant on the two nights in question, prior to the crime with which defendant was charged. The State attempts to justify this cross-examination and the subsequent testimony of the two women on the grounds that it went to the credibility of defendant's testimony and that it was proper impeachment. Cross-examination should be limited to matters brought out on direct examination. (*People v. Smith,* 413 Ill. 218.) The question of whether defendant had ever been in the vicinity of the complaining witness's apartment was not gone into on direct examination. It was irrelevant to the issue in the case and it was error to permit the State to cross-examine defendant on this subject and also error to permit the two women to testify that they had seen defendant in the vicinity on other occasions. It is improper to ask a witness questions on irrelevant matters on cross-examination for the purpose of contradicting his answers. *People* v. *Simmons,* 274 Ill. 528; *United States* v. *Lawinski,* (7th cir.) 195 F.2d 1.

Defendant was recalled as a witness on surrebuttal and was asked whether he ever grabbed or attacked Mrs. Lowthorp and Mrs. Barkley, but he was not permitted to answer. The testimony of the two women was improperly admitted, but once it was before the jury, defendant should have been given an opportunity to deny it. However, we are of the opinion that in view of defendant's denial that he had ever been at 2840 West Fifth Avenue, the error in sustaining an objection to the question was not prejudicial.

Defendant was asked on cross-examination whether he had been attending school between February 17 and March 1, and defendant volunteered the information that he was arrested at that time. He now claims that the ques-

tion was improper and that his own response was prejudicial. There is nothing in the record to show that the prosecutor was attempting to bring out this evidence and the defendant could have answered the question without mentioning that he was under arrest at that time. Defendant, having volunteered the information, is in no position to complain. *People* v. *Pride,* 16 Ill.2d 82.

Defendant also assigns as error the fact that the court sustained objections to questions as to whether he denied the accusation made by the prosecuting witness at the time she identified defendant at the line-up. She had testified that when she saw the defendant in the line-up, she said "That is the man who raped me" and defendant said nothing. A police officer testified that defendant was not asked about the crime at that time. On defendant's direct examination he was asked whether anyone had asked him whether he was guilty of the crime. The same question was repeated several times in different form and objections to all such questions were sustained. An examination of the questions discloses that they were all leading questions and the objections were properly sustained on that ground. Also, they did not tend to rebut the State's evidence that he stood mute when accused. We find no prejudicial error in the trial court's rulings on these questions.

The complaining witness testified on direct examination that she identified defendant from a picture contained in a book of known sex offenders. Objection to this description of the book was sustained and the phrase "known sex offenders" was stricken. The remark by the witness was made in response to the question "On Friday what did you do, if anything?" While the remark was improper, it was not called for by the question and we are of the opinion that in view of that fact, together with the prompt striking of the language in question, no prejudicial error resulted.

One further assignment of error remains. It is contended that the testimony of the police officer as to the

laboratory findings of seminal stains, hair and feathers on the sheet and on defendant's coat was erroneously admitted. It is contended that such testimony was irrelevant and also that the officer should not have been permitted to express an opinion as to whether the hairs were from a white person or a colored person nor to testify that the material found on the sheet was similar to that found on defendant's coat. The relevancy of this evidence is so plain as to admit no argument. In support of defendant's second contention it is claimed that the similarity of the items was a matter within common knowledge and that the jury should have been permitted to draw their own conclusions as to their similarity. The record discloses that the officer's qualifications as an expert were admitted. He testified as to scientific tests on the material and to the results of a micro-analysis. On the basis of these tests, he expressed his opinion, without objection by defendant, that the hair and feathers on both articles were similar and that both the sheet and the coat contained traces of human semen. Defendant did object to the question of whether the hairs were from a white person or a colored person on the ground that there was no scientific basis for such a distinction. The witness then testified that there was some controversy by the authorities on the question, but that the witness's experience showed that such a distinction could be made. He was then permitted to answer the question and replied that in his opinion the hairs on both the sheet and the coat were from a white person. We believe that there was no error in permitting the witness to express his opinion on the question. The fact that there is a difference of opinion among the authorities goes to the weight of the evidence, rather than its admissibility.

The record here discloses that, in several respects, error was committed in the trial of this case. However, the purpose of review in a criminal case is not to determine

whether the record is perfect, but to determine whether the defendant has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond all reasonable doubt. (*People* v. *Cardinelli*, 297 Ill. 116.) Where it appears that the errors in the record could not have reasonably affected the result, the judgment of conviction should be affirmed. (*People* v. *Lopez*, 10 Ill.2d 237; *People* v. *Sleezer*, 9 Ill.2d 57; *People* v. *Henry*, 3 Ill.2d 609.) In the present case, the complaining witness was first accosted by her assailant in her lighted bathroom and was face to face with him at a very close distance. She gave the police a complete description of the man who had raped her and positively identified defendant at the line-up and at the trial. Her experience at the hands of her assailant was such as to fix in her mind the appearance of this man. In view of her positive identification, together with the other evidence pointing to defendant's guilt, we believe that defendant's guilt was proved beyond all reasonable doubt. The errors which occurred at the trial court cannot be said to have influenced the jury's verdict, for in view of the overwhelming competent proof of defendant's guilt, the jury could scarcely have arrived at any other verdict. The judgment of the trial court is therefore affirmed.

*Judgments affirmed.*

SCHAEFER and KLINGBIEL, JJ., dissenting:

As this case went to the jury the issue was one of identification. The complaining witness was positive in her identification of the defendant, and she had had an opportunity to observe the man who committed the crime. On the other hand, the defendant's alibi was corroborated by several witnesses, and it was more convincing than is usually the case. The defendant was entitled to a clean and fair trial of this issue, and in our opinion he did not receive it.

The opinion of the court concedes that it was error to

admit the testimony of two other women as to attempted attacks upon them by the defendant. From the record we can not escape the conclusion that these witnesses were produced and their testimony offered in a deliberate and unfair effort to prejudice the jury against the defendant. And this error was compounded when the defendant was not allowed to deny the irrelevant charges with which he was thus unexpectedly confronted.

Repeated questions as to the defendant's whereabouts on specific dates in February and March culminated in the question, "Did you attend school between February 17 and March 1st, 1951?" It seems to us that the court is being unusually naive when it says that the defendant volunteered the answer that he was under arrest at that time. We think that the prosecutor's repeated questions about this irrelevant matter were intended to elicit exactly the response that they did elicit.

It may well be that the complaining witness's statement that she selected the defendant's picture from a book containing pictures of "known sex offenders" was not anticipated by the prosecution. But after that statement was made, the book itself was marked for identification as an exhibit, and the defendant's picture taken from that book was admitted in evidence over the defendant's objection. What purpose it served, other than to generate prejudice, is not apparent. The defendant testified, so that the prosecution had an opportunity to impeach him by showing prior convictions if there were any. No such evidence was offered.

The defendant did not, in our opinion, receive a fair trial on the issue of his guilt. In this case, moreover, the jury fixed the penalty. In such cases this court has consistently reversed and remanded when incompetent and prejudicial evidence was put before the jury, on the ground that "Nobody can know what the jury would have done had they the opportunity to fix the punishment upon an acquaintance with only competent and admissible evidence."

(*People* v. *Smith,* 413 Ill. 218, 223; see also *People* v. *Dukes,* 12 Ill.2d 334; *People* v. *Jackson,* 9 Ill.2d 484; *People* v. *Crump,* 5 Ill.2d 251; *People* v. *Stanton,* 1 Ill.2d 444.) We think that course should be followed here.