THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CARL SIGMAN, Defendant-Appellant.

Second District (2nd Division)    Nos. 75-56, 75-57 cons.

Opinion filed October 19, 1976.

Ralph Ruebner and Joshua Sachs, both of State Appellate Defender's Office, of Elgin, for appellant.

James M. Carr, State's Attorney, of Sycamore (Phyllis J. Perko, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Defendant, a City of DeKalb police officer, was charged with the crime of burglary in each of 19 separate indictments. Two trials on indictment #73-CF-216 resulted in hung juries. He was then tried on indictment #74-CF-26 charging burglary, was found guilty by a jury, and on November 22, 1974, was sentenced to serve not less than 4 nor more than 12 years in the penitentiary. Later, on the same day he entered pleas of guilty to the 18 other indictments (including #73-CF-216) and the circuit court of DeKalb County imposed terms of not less than 4 nor more than 12 years on each of them to be served concurrently with the sentence in #74-CF-26. The defendant appeals contending that his convictions are the result of prejudicial errors in the admission of evidence; that the State did not prove beyond a reasonable doubt that he entered the building with intent to commit theft; that the trial court abused its discretion in refusing defendant's proposed continuance of the sentencing hearing for psychiatric evaluation; that defendant's guilty pleas to the 18 other burglary indictments were not voluntarily given; and that the sentences are excessive. (Appeal No. 75-57 is from the jury verdict and sentence and

appeal No. 75-56 is from the guilty pleas and sentences in each of the other 18 indictments. Both appeals have been consolidated for the purposes of review.)

At trial defendant was represented by the same privately retained counsel who had represented him at the earlier trials. Defendant's motion to suppress confessions based on the State's failure to observe the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, was denied by the trial court.

The following is a summary of the evidence relevant to the issues raised on appeal which was introduced at the trial on indictment #74-CF-26, charging defendant with burglary of the premises of Decor Plywood and Door, Inc. (Decor) on December 18 or 19, 1973. Defendant worked on the 11 p.m. to 7 a.m. shift, and on the evening of December 18 was assigned with squad car No. 332 by the sergeant of the shift, to Zone 3 (being the south portion of the City of DeKalb, south of the railroad track or of Lincoln Highway); Officer Miller, in Car No. 333, was assigned to Zone 2 (being the northeast portion of the city); Officer McMorrow, in car No. 335, was assigned to Zone 1 (in the northwest portion of the city). All DeKalb police officers were under orders not to leave a squad car without notifying the dispatcher.

Sergeant Huber of the Sycamore police department testified that on December 18, 1973, it had been snowing since 9 p.m., and that when he came on duty at 11 p.m. for his 11 to 7 shift, two or three inches of snow had accumulated. As part of his security check he drove southwesterly on Sycamore Road from Sycamore and turned west into Bethany Road to check the three buildings there: Decor, Flaherty and the YMCA. As he passed Decor he saw a set of tire tracks turning into the Decor driveway and saw a DeKalb squad car with headlights shut off along the west side of the building. After turning around in the Flaherty lot, he signalled to the DeKalb squad car with his spotlight but saw no one inside or around the building. After he checked the YMCA building and was driving back to the front, a spotlight signalled from the DeKalb car. He estimated the elapsed time between his signal and the DeKalb car's signal to be five to seven minutes. Sergeant Huber then drove around to check the front door of the YMCA building and proceeded to Decor. As he pulled into the Decor lot he saw no tire tracks other than those of the DeKalb squad car. Huber parked his car in front of it and saw defendant, between the building and his squad car, walking toward him. Defendant told Huber that he had found a door open there and was about to have his department "contact" Sycamore. Defendant then agreed to help Huber check the building but before doing so went back to his car; Huber believed the defendant did so to make a radio call. Huber "contacted the other Sycamore units on patrol," advised them that he was at Decor and

that there was no need for them to come out because he was with a DeKalb city squad car. Before he went in Huber drew his weapon from his holster; defendant did not. Inside the door Huber saw two or three damp footprints on the floor entering the building. They both then checked various rooms and Huber observed that the door in the bookkeeper's office was open and that its striker-plate and two screws were lying on the floor. He pointed out to defendant that "it appeared to have been broken in." Defendant called out to Huber that a door in another office had been broken in.

Mr. Kenneth Heide, part owner of Decor, was called and checked the building with both officers. Huber told Heide that it looked like somebody had attempted to get in the safe. Upon checking Mr. Heide found no money or items missing either from the safe or from a drawer in a filing cabinet where some money was kept. Huber further testified that he had pointed out to Mr. Heide that "a tool, say a knife, had apparently been used to slip the lock on the [west] door" of the building. When Huber left the building he observed that there were two sets of footprints coming from the DeKalb city car, one set from Huber's car, and one set from Heide's car, and that the only tire tracks were from the three vehicles.

Carl Bauer, DeKalb Police Department's radio dispatcher, testified that at about 12:07 a.m. on December 19 he tried to contact defendant by radio but received no response. After getting no response to his second attempt, he tried a third time at about 12:15. This time defendant answered, saying he was busy with a Sycamore squad car; that defendant had not "gone off the air" prior to Bauer's first call. Bauer further testified that according to the "Rules and Regulations" police officers were supposed to call in before they left their squad car and to report their location.

Other members of the DeKalb Police Department corroborated Bauer's attempt to reach defendant by radio and confirmed the requirement that police officers were to maintain radio contact and not go off the air without notice to the dispatcher. Sergeant Thompson of the DeKalb Police Department was one of these. He testified that shortly after the incident at Decor he arranged to meet with defendant and had a conversation with him. In that conversation defendant told Thompson that he had driven into the University Motors' driveway (on Sycamore Road east of Decor) to come back into the city. He had directed his spotlight on Decor, noticed that a door looked as if it had been tampered with, drove over, found the door ajar or unlocked, then saw the Sycamore squad car and got the officer's attention. Then he and the Sycamore officer "checked out the business" where there had appeared to be a breakin. Thompson reprimanded defendant for not checking with his

supervisor before going out of the city. Defendant said that he "won't do it again" and cut the conversation short by putting his car in gear, stating that he "had to start checking his zone." That was at about 1:45 a.m. on December 19.

Officer Miller, who was assigned to Zone 2 on the 11 to 7 shift on the night of December 18-19, testified that while checking the buildings in the northern end of his zone, he saw defendant's squad car at about 11:30 p.m. driving along Sycamore Road, and "it appeared he was checking the zone or doing some of my business for me, checking the businesses in my area of patrol." At about 12:30 a.m. he heard defendant's radio report that he was coming back on the air after "assisting a Sycamore car with a break-in". He estimated that Decor's location is about 2½ miles from the nearest point of Zone 3 (to which defendant was assigned). Miller further testified that at about 2:30 a.m. on December 19 he heard another radio call from defendant saying that he would be out of his patrol car in a laundromat on Sycamore Road (in Zone 2) which is near other businesses and the offices of Doctors Little and Jenkins, dentists.

Lieutenant Richard Moudy of the DeKalb Police Department, in charge of patrol operations, testified that on December 20, 1973, in the parking lot of the municipal building, he met defendant, who was then going on duty, and told him that Police Chief Joseph Maciejewski wanted to talk to him. He asked defendant to accompany him to the station. They went to the Chief's office and Moudy described the meeting, in a series of answers to questions, as follows:

> "The Chief asked Carl Sigman if he knew why he had been brought in, and Carl replied that he did not. The Chief said to Carl that it had been reported by his supervisor, Richard Lorenson, that he had on occasion left his squad car without notifying the radio dispatcher who had attempted to contact him and had gotten no response, and in addition to that he had left his patrol zone on several occasions and the Chief asked Carl if he had been advised by his supervisor not to leave the squad car unless he notified the radio dispatcher. Carl said yes, he had been advised. The Chief asked him if he had left his squad without notifying the radio operator on these occasions, and Carl Sigman replied, yes, he had.
> * * *
> The Chief said he had been apprised of an incident that took place at Decor Plywood in which the radio operator had attempted to contact Sigman for some ten minutes. He asked Carl if he could explain what took place out there, and Carl did admit he had been out of his squad car at Decor for about ten minutes. The Chief, at that time, asked him to remove his police equipment.
> * * *

He asked him to remove his gun belt and empty his pockets, and take all of his police equipment and place it on his desk.

\* \* \*

He [defendant] removed his gun belt, his badge, and emptied his pockets and placed the contents upon the desk.

\* \* \*

The Chief asked Carl to recount in detail what he was doing for that 10 minute period at Decor, and Carl stated that during that ten minute period he was in the building, and—excuse me—the Chief asked him how he got into the building, and Carl replied he guessed the door was open. Then the Chief asked Sigman how he got the door open, and Sigman replied, with the knife the Chief was holding in his hand. That was the knife Carl had taken out of his pocket.

\* \* \*

The Chief asked Carl if he knew his rights, and Carl replied, yes. The Chief asked him if he should call an attorney, and Carl replied, yes."

The conversation ended about 11:15 p.m. Lieutenant Moudy testified on cross-examination that defendant was not under arrest until the chief told Moudy to "book him," and that while Sigman asked for an attorney, he did not call one.

Chief Maciejewski testified, over objection, to his conversation with defendant at about 11 p.m. on December 20 (being the same conversation at which Lieutenant Moudy was present, and as to which Moudy testified). The chief testified that, after asking defendant where he was during the ten minutes that he was outside of radio contact shortly after midnight the preceding night, defendant acknowledged being inside the Decor building for a few minutes. The chief continued to question him about how he got inside the building and defendant, after first stating that the door was open, said "I got in with that knife in your hand." The knife he referred to was a pocketknife with a broken tip which defendant had earlier taken from his pocket and placed on the desk. The chief testified that at that point he got up and said "Carl, you know your rights, you better get a lawyer. Do you want one?" Defendant answered "I think I do." The chief testified that he then said to Lieutenant Moudy "Book him and let him call a lawyer." In response to the prosecutor's question as to the possible means of discipline of defendant, the chief stated that he could decide that no discipline was called for, he could give an oral or written reprimand, or a five-day suspension; and that the most he could do was to suspend him and within five days request the Board of Fire and Police Commissioners for a hearing in order to dismiss him or extend the suspension. The chief further testified that he had not decided on any of

these options before defendant entered his office. He testified that he put the defendant under arrest just before he ended the interview, after Sigman stated he "got in with that knife." On cross-examination the chief denied that he was focusing his investigation of the Decor burglary on the defendant before that interview but that he was investigating several police officers as to various matters "at that time."

Two witnesses for the defense who had known defendant for about ten years testified to his reputation in the community as an honest law-abiding man. Defendant's present employer also testified that he hired defendant 1½ years ago and that defendant's reputation was very good for being an honest and law-abiding man.

Defendant testified that he did not remember whether he had been assigned to a particular zone on the night of the Decor burglary; that he was in the area of Sycamore and Bethany Roads shortly after midnight; that he turned into Bethany Road and into the Decor driveway (250 feet west of Sycamore Road) to turn around; that while doing so he observed the first door on the west side slightly ajar. He stopped his car, checked the door, went inside and checked the immediate showroom. While there he saw car lights go by so he went outside to his squad car and noticed a Sycamore squad car in Flaherty's lot. He tried unsuccessfully to signal toward it with his spotlight. After the Sycamore squad car turned around, the officer noticed defendant's signal, responded and then drove over to defendant. In general, defendant's testimony was consistent with Sergeant Huber's concerning the checking of the interior. When asked if he was out of his zone at any other time that night, defendant said "I may have. I am not sure." Defendant corroborated the testimony of Lieutenant Moudy and the chief concerning the interview in the chief's office on December 20, except that he testified that when the chief asked the defendant how he got into Decor, defendant answered that the door was open; that the chief then said "Don't lie to me, didn't you slip it with your knife?" and that the defendant answered "No, sir, I did not." Defendant further testified that in October, 1973, he had been referred to the Board of Fire and Police Commissioners for disciplinary action after a fight with a prisoner during which defendant had struck the prisoner's head with his "billy club"; that the chief told him after that incident that because defendant "could not handle people in a reasonable manner, he would have my job."

On cross-examination defendant testified that he did not notice any tire tracks or footprints near the door of Decor which defendant said was ajar, and did not remember telling Officer Thompson about turning around in University Motors' parking lot and from there seeing Decor's door tampered with or open. Defendant admitted having turned off his headlights but stated that he left his parking lights on. He did not recall

whether he told Sergeant Huber, when Huber arrived at Decor, that defendant had been inside the building and had checked part of it, and stated "I don't recall exactly the conversation I had with him." Defendant admitted testifying on direct examination that he could not recall whether, with the exception of the time at Decor, he was outside of his zone on the night of December 19; he also did not recall having been at the offices of Doctors Jenkins and Little after 12:30 a.m. on that night. Over defense objections the prosecutor was allowed to ask defendant whether he had told Lieutenant Moudy, during a tape-recorded interrogation, that on that night he had entered the respective offices of Doctors Little and Jenkins, pried open the door of a cabinet in Doctor Little's office and took the cash box. Defendant answered that he did not recall the questions or his answers.

Lieutenant Moudy testified in rebuttal for the State, over defense objections, regarding defendant's statement about his entry into the offices of Doctors Little and Jenkins, and was allowed to play a tape of that statement to the jury. Officer Berke of the DeKalb Police Department also testified in rebuttal that on December 19 he was assigned to investigate the breakin at the offices of Doctors Little and Jenkins on Sycamore Road and in that connection was talking to all officers who worked the previous night, to inquire whether they had seen anything or anyone unusual in the area; that when he talked to defendant that defendant told Berke that he had checked the building and that the doors appeared locked as well as he could see from the car.

■■ We first consider defendant's contention that the defendant's inculpatory admission to the police chief that he used his knife to open the door at Decor was involuntary because it was obtained under the threat of departmental discipline if defendant failed to answer the chief's question. It should be noted that defendant's motion to suppress and his argument thereon were based on the failure to observe the *Miranda* requirements, not on the involuntariness of the statements under *Garrity v. New Jersey* (1967), 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616. Moreover, defendant presented no evidence at trial which would permit a determination as to the applicability of *Garrity* to this case. In *Garrity,* the New Jersey police officers were advised that they would be discharged under the State's forfeiture of office statute if they claimed their privilege against self-incrimination. It was because of the compulsion resulting from a choice between either certain dismissal, under the New Jersey statute, or self-incrimination that the Supreme Court held the police officers' statement in *Garrity* were involuntary. In the case at bar, defendant was not threatened with dismissal if he declined to answer the chief's question, and there is no evidence that defendant feared dismissal if he were to claim the privilege. Moreover,

the chief had no power to discharge defendant and the record is barren of any evidence of police department policy or rules requiring discharge if an officer claims the privilege.

From our examination of the entire record, including the transcript of testimony on defendant's motion to suppress, and including defendant's use of a tape recorder to facilitate preparation of his statement concerning the other burglaries, it is abundantly clear that there was no coercion and that defendant's inculpatory admission was voluntary.

■■ We next consider defendant's contention that the State improperly introduced "under the guise of impeachment" evidence of defendant's confession to the burglaries of the offices of Doctors Jenkins and Little. On direct examination defendant, when asked whether he left his zone at any time during the night of December 19, after the Decor burglary, testified "I may have. I am not sure." During cross-examination defendant did not "recall that," when asked by the prosecutor if he had been at the offices of Doctors Jenkins and Little on the night in question after 12:30 a.m., and did not recall his conversation with Lieutenant Moudy concerning those offices. Even after being told the substance of that conversation defendant did not recall his statement to Lieutenant Moudy. Throughout his testimony defendant denied gaining entry to Decor with a knife. While ordinarily impeachment of a witness on a collateral matter is not allowed, particularly when it involves the introduction of evidence of other crimes (*People v. Kirkwood* (1959), 17 Ill. 2d 23, *cert. denied*, 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623), proof of other crimes is admissible "where such evidence is relevant to a contested issue * * * and tends to establish the crime charged" (*People v. Davis* (1958), 14 Ill. 2d 196). In the case at bar, defendant was accused of burglarizing Decor and the State was required, in order to sustain its burden, to establish beyond a reasonable doubt that he entered the premises with the intent to commit a felony. Defendant had denied that he forcibly entered the premises, and the fact that no property was taken, made the State's burden more difficult. It was, therefore, proper to admit in rebuttal the State's evidence of other contemporaneous offenses committed by defendant. Moreover, the proximity in time and place of the burglaries committed by the defendant at the offices of Doctors Little and Jenkins and the substantial similarity to the burglary of Decor, warranted admission of evidence of those burglaries to prove intent, especially where, as here, its probative value in establishing guilt outweighs any prejudicial effect. (*People v. Cage* (1966), 34 Ill. 2d 530, 534.) The ultimate purpose of the evidence of the other burglaries was to prove defendant's intent, because of his denial of any involvement in the burglary and because no property was taken. The State was justified under the circumstances in introducing in rebuttal evidence of

defendant's subsequent burglary offenses. (See McCormick, Evidence §190, at 452 (2d ed. 1972).) These factors and the probative value of proof of those offenses outweighs any possible prejudicial effect of the introduction of such evidence.

■■ While an admonitory instruction regarding the purpose for which evidence of other crimes was admitted is advisable, the trial court has no duty *sua sponte* to give such instruction restricting the use of proof of other offenses. Under the circumstances the trial court did not err in admitting into evidence proof of the subsequent burglaries committed by the defendant on the night of December 19.

Defendant contends that evidence that defendant requested the advice of counsel and declined to discuss the case further, after his arrest, violated his Fifth Amendment privilege and was inadmissible. Lieutenant Moudy had testified at trial that it was the chief who asked defendant "If he should call an attorney, and Carl replied 'Yes'." Defendant interposed no objection to that testimony. While defendant objected to all of the chief's testimony, including that relating to the chief's question about defendant's getting a lawyer, he did so on the ground that the *Miranda* procedures had allegedly been violated. Defendant himself testified that the chief asked him "Do you believe you need a lawyer, and that defendant responded 'Yes, I believe I do'."

■■ It is thus apparent that the evidence demonstrated that it was not defendant who terminated, or indicated a desire to terminate, the questioning, or his desire to consult an attorney. It was the chief of police who terminated the interrogation with his inquiry as to defendant's need of a lawyer. Moreover, defendant's failure to object to this testimony and the defendant's own testimony which repeated that conversation, constitute a waiver of that issue. (*People v. Newbury* (1972), 53 Ill. 2d 228, 238: *People v. McCorry* (1972), 51 Ill. 2d 343, 351.) The testimony in question was not emphasized by the prosecution during examination of the witnesses or in closing argument. Viewing that testimony in the totality of the circumstances, the context in which it was given, and the other overwhelming evidence, it could not have reasonably affected the outcome of the trial. See *People v. Marchese* (1975), 32 Ill. App. 3d 872, 880.

■■ Next, the defendant contends that the State did not prove beyond a reasonable doubt that the defendant intended to commit a theft when he entered the Decor building, because there was no proof that any property was taken from the building when he left. Defendant concedes that proof of intent must necessarily be circumstantial. He argues, however, that the fact that he left the premises "empty handed," with "valuable property * * * left behind," is inconsistent with intent to commit theft. Proof of unlawful breaking and entry into a building

containing personal property which could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary. *People v. Johnson* (1963), 28 Ill. 2d 441, 443.

The defendant admitted to Lieutenant Moudy and to the chief that he used the knife to gain entry. Sergeant Huber testified that a knife had apparently been used to slip the lock on the west door of the Decor building. There was testimony of extensive damage to interior doors. In addition to the foregoing, testimony of subsequent burglaries committed by the defendant on the night of December 19 demonstrates his intent to commit a theft. Huber testified that when he arrived at Decor he saw only one set of tire tracks turning into the driveway that appeared to be those of defendant's squad car, and two sets of footprints going to and from the defendant's vehicle, one set from Huber's vehicle and one set from Heide's car. The credibility of defendant's testimony that he entered the building to investigate a suspected burglary was a matter for the jury's consideration, and the jury obviously did not believe it. *People v. Loden* (1975), 27 Ill. App. 3d 761, 763.

The above and other circumstantial evidence at trial established beyond a reasonable doubt that defendant had the intent to commit larceny at Decor when he entered the building. Defendant's failure to take any property may, inferably from the record, be due to the arrival on the scene of Sergeant Huber. The facts in *People v. Hutchinson* (1964), 50 Ill. App. 2d 238, on which defendant relies, are not similar. There a "serious doubt" existed as to defendant's intent. His entry into an unlocked kitchen was made in broad daylight, in open view of two men working nearby; defendant did not ransack the residence and left in an orderly manner.

We next consider defendant's contention that the trial court abused its discretion in refusing defendant's request to continue the sentencing hearing for the purpose of having a psychiatric evaluation made of the defendant at Hines Veterans Hospital. After the jury returned the guilty verdict on November 6, 1974, defense counsel agreed to setting the hearing in aggravation and mitigation for November 22, 16 days later. He made no mention of any desire for the preparation of any psychological or psychiatric evaluation. It was not until the date of the hearing, November 22, that counsel requested a continuance for that purpose. The trial court denied the motion after counsel stated in response to the court's question that counsel was not contending that defendant was insane, and because the trial court did not desire to delay the hearing.

At the ensuing hearing in aggravation and mitigation the presentence report was presented. It disclosed, among other things, that defendant's children had health problems and that defendant received a discharge from military service after a few months' service due to his inability to

adjust socially or emotionally to service life. Defendant testified as to his daughter's poor health and that those problems had been a financial and mental strain for him. Defense counsel also produced, in support of that testimony, letters evaluating the hearing problems of defendant's older daughter and a medical history of defendant's younger daughter, as well as a copy of defendant's service discharge.

■■ Section 5—3—2(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—3—2(b)) dealing with presentence reports, makes it clear that whether a mental examination should be made is within the trial court's discretion. Under the circumstances here we are unable to say that the court abused its discretion in refusing defendant's request for a continuance of the hearing for that purpose.

At the sentencing hearing on November 22, the presentence report disclosed that there were 18 other burglary charges in DeKalb County pending against defendant. Lieutenant Moudy and the police chief also testified at the hearing that defendant had confessed to each of them. No objection was made to the admission of the report or to that testimony which included a complete list of establishments burglarized by the defendant. At the hearing the trial court, in referring to those cases, stated in part:

> "* * * I think both the defense counsel and the State's Attorney owe the obligation to the citizens of DeKalb County to do the best job they know how complying with the rules of law, but not to waste time, effort and money of the police officers, Court officials, bailiffs, jurors and judges.
>
> * * * But, if you were to start to try each one of those cases right today, have either of you estimated the cost to the tax payers of DeKalb County?
>
> * * *
>
> Now, I just cannot go along with any objections in this case, and I can't see putting the tax payers to the cost of each and every case, but this defendant is entitled to such trial if he wants on each and every case."

Following the denial of probation the defendant was sentenced to 4 to 12 years in prison. At the end of the hearing his privately retained counsel withdrew. Case 74-CF-26 was called up later the same day. The court appointed an assistant public defender (Mr. Larson) and the trial judge stated to Mr. Sigman that "It was my thinking when I sentenced this defendant this morning * * * that the sentence would run concurrently with any other case." He then stated to Mr. Larson:

> "Before accepting any other arrangements in those cases, I would respectfully request that you sit down and discuss the matter with the defendant so that there isn't any question about any pressure or

any threats of any kind, and that he fully knows what he is doing, do you understand that? You take time and discuss it with Mr. Sigman."

Following a recess Mr. Larson assured the judge that he "discussed all these matters" with the defendant. Mr. Sigman then pleaded guilty to all remaining counts and the court imposed sentence of 4 to 12 years on each count to run concurrently with any other sentence.

Defendant contends that the guilty pleas were neither voluntarily nor intelligently given. He concedes that defendant was admonished in accordance with Supreme Court Rule 402 but argues that the trial judge, by his statement, "encouraged" defendant, "not very subtly, to plead guilty to all remaining charges."

■■ From a careful examination of the entire record we are convinced that the defendant's guilty pleas to the 18 other indictments charging burglary were intelligently and voluntarily given. He was well represented both at trial by his privately retained counsel, and at the later hearing on November 22 by Mr. Larson. The trial judge did not initiate the guilty pleas. He merely told the defendant the sentence he would receive if he did plead guilty. We find nothing in the record to indicate that the trial judge would have imposed a harsher sentence had the defendant gone to trial on the 18 indictments. In brief, the record discloses the requisite voluntariness and intelligence on the part of the defendant. (In passing, we deny defendant's motion to strike the portion of the State's brief dealing with this issue.)

Lastly, we consider the defendant's contention that the sentence is excessive in the light of the defendant's history and reputation and the nature and circumstances of the offense. The trial judge has a superior position to that of a reviewing court to evaluate the circumstances of the offense and to impose sentence, and reviewing courts should not reduce sentences without a substantial reason for doing so. (*People v. Morgan* (1974), 59 Ill. 2d 276, 282.) We are unable from our search of the record to find any substantial reason for reducing sentence.

■■■ Defendant urges that in sentencing the trial court improperly considered the 18 other burglary counts pending against him. However, defendant did not object to the admission of either the presentence report which disclosed them or to the testimony of Lieutenant Moudy and the police chief concerning the defendant's having confessed to committing those burglaries. By his failure to object the defendant waived any error in their admission. (*People v. Cook* (1975), 31 Ill. App. 3d 363, 367-68.) In *People v. Adkins* (1968), 41 Ill. 2d 297, 300-01, the court said:

"In Illinois, too, we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the

adversary circumstances of a trial. * * * 'It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, * * * the judge should know something of the life, family, occupation and record of the person about to be sentenced.' "

In *People v. Whiteaker* (1975), 30 Ill. App. 3d 848, based in part on the authority of *Adkins*, we held that the trial court did not err in considering defendant's prior juvenile arrest record in determining the defendant's character and the extent of punishment. We hold, therefore, that the trial court did not err in the case at bar in considering the 18 burglary indictments.

For the reasons stated in this opinion the judgments of the circuit court of DeKalb County are affirmed.

Judgment affirmed.

T. J. MORAN, P. J., and DIXON, J., concur.