NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 230735-U

NO. 4-23-0735

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Mercer County |
| KEVIN PATRICK HOCKENBERRY, | ) | No. 21CF89 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed the judgment of the trial court because (1) the trial court did not commit plain error by admitting hearsay evidence and (2) defense counsel did not render ineffective assistance by failing to object to other-crimes evidence or request a limiting instruction.

¶ 2 In November 2021, the State charged defendant, Kevin Patrick Hockenberry, with solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2020)). In March 2023, a jury found defendant guilty, and in May 2023, the trial court sentenced defendant to 33 years in prison.

¶ 3 Defendant appeals, arguing that (1) the trial court erred when it allowed inadmissible hearsay statements relating to the results of defendant's food-allergy testing and (2) defense counsel rendered ineffective assistance by allowing the State to present other-crimes evidence that defendant (a) solicited the murder of a second individual, which was not charged, and (b) was being prosecuted for several crimes at the time of the charged offense.

¶ 4 We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                    A. The Charges and Motion for Injunctive Relief

¶ 7            In November 2021, the State charged defendant with solicitation of murder for hire (*id.*), alleging that he "procured another to commit first degree murder pursuant to a request for money, in that [he] agreed to pay $10,000.00 to have Meeghan Lee killed." Lee was an assistant state's attorney in Mercer County who had been prosecuting defendant in several unrelated cases.

¶ 8            In May 2022, the State filed an "Amended Motion for Injunctive Relief," (1) alleging that defendant was willfully refusing to consume food and beverage and (2) seeking an order allowing the State to use force to (a) collect blood samples for health monitoring and (b) feed defendant, if necessary.

¶ 9            That same month, the trial court conducted a hearing on the State's motion. The State called Tracey Burgard as its first witness. Burgard testified that she was a nurse practitioner who treated inmates at the Mercer County jail. In that capacity, she met with defendant approximately 10 times to address his weight loss, which was a result of his "restricted eating, self-imposed." Burgard explained that defendant had "restricted his foods that he will accept, stating various allergies, although he has no record of any allergies." At the time of Burgard's testimony, she estimated that defendant had lost 90 pounds since his incarceration (which, his later presentence investigation report showed, began in January 2020).

¶ 10           The State also called Justin Hartman, the Mercer County jail administrator, who testified that when defendant was booked into the jail on different charges in 2014 and 2019, defendant told staff that he did not have any special dietary needs. When booked in 2020, defendant told staff he did not have any allergies but stated that he did not eat milk or eggs.

¶ 11           In response to questions from defense counsel, Hartman testified that about a year

prior to the hearing, defendant was placed on a "Life Flight" from the Mercer County jail to an outside medical facility because defendant "claimed he had tomatoes or something [he was allergic to] in his meal." The State then asked Hartman, "If you know, was there a finding given involving whether or not he was telling the truth about that?" Hartman answered, "I talked to the medical staff, the nurse that was in charge of [defendant], and the statements that [defendant] had made and the actions that he was portraying were false."

¶ 12      The trial court granted the State's motion and entered an order directing defendant's blood to be drawn and tested for food allergies.

¶ 13                            B. The State's Motion *In Limine*

¶ 14      In July 2022, the State filed a motion *in limine*, requesting that the trial court allow evidence that defendant was in custody on a different pending criminal charge at the time of the offense.

¶ 15      That same month, the trial court conducted a hearing on the State's motion. When the court asked what defense counsel's position was on the State's motion, counsel answered, "Normally I would object *** but I believe it's going to be part of our defense that it's obvious where this incident allegedly took place. So, I don't think the issue of custody is going to come up. No resistance."

¶ 16      The trial court then ruled, "[T]he fact that during the testimony it will be revealed that while [defendant] was in custody these events are alleged to have happened. I don't want any of the witnesses referencing any of the other pending cases."

¶ 17                            C. The First and Second Jury Trials

¶ 18      Defendant's first jury trial began in August 2022. After two days of testimony, the jury deliberated for approximately 1½ hours before the trial court declared a mistrial based upon

a hung jury.

¶ 19　　　　Defendant's second jury trial began in November 2022. On the first day of trial, the trial court granted defendant's motion for a mistrial based upon a discovery violation.

¶ 20　　　　　　　　　　　D. The Third Jury Trial

¶ 21　　　　In March 2023, the trial court conducted defendant's third jury trial.

¶ 22　　　　　　　　　　　1. *Joseph Howard-Rogers*

¶ 23　　　　Joseph Howard-Rogers testified that he was an inmate at the Mercer County jail from July 2021 to October 2021. While there, he was housed in the C-Pod with seven other inmates, including defendant. However, due to the manner in which inmates were released from their cells to the common area on a rotating basis, Howard-Rogers only interacted with three of those seven: defendant, Christopher Young, and "Randy."

¶ 24　　　　Howard-Rogers stated that defendant's nickname was "Germany" because he told the other inmates that he was from Germany and spoke with a German accent. While incarcerated, Howard-Rogers played cards and board games with defendant. Howard-Rogers testified that on August 30, 2021, while playing cards with defendant, defendant asked Howard-Rogers "[i]f [Howard-Rogers] had anybody who [could] take care of some business." The following colloquy then ensued between the State and Howard-Rogers:

> "Q. And what did that mean to you?
>
> A. To take care of two people for him.
>
> Q. He wanted you to take care of two people for him?
>
> A. Yes.
>
> Q. Did he specify who those two people were?
>
> A. Yes.

- 4 -

Q. Who?

A. The jailer and a judge, Hartman and Ms. Lee.

\*\*\*

Q. And did he elaborate on what taking care of them meant?

A. Yes, after a while. Yes.

Q. What did he say?

A. He was like, he had money and he was trying to get them tooken [*sic*] care of because that was the only way he could get out of jail.

Q. And to take care of them, did you two agree on the price?

A. Yes.

Q. How much?

A. [$]5,000 apiece."

¶ 25 Later that same day, Howard-Rogers notified Hartman about the conversation with defendant. Howard-Rogers stated that about a week after alerting Hartman, he was taken to Davenport, Iowa, where he was interviewed by law enforcement officers about his conversation with defendant. Howard-Rogers stated that he was not promised anything in exchange for his testimony.

¶ 26 The State introduced still photographs taken from jailhouse surveillance video on the date of Howard-Rogers's conversation with defendant, which showed (1) Howard-Rogers seated with defendant in C-Pod (State's exhibit No. 1) and (2) Howard-Rogers alerting Hartman to the conversation in the booking area of the jail (State's exhibit Nos. 2 and 3).

¶ 27 Later, Howard-Rogers met with law enforcement officers at the Mercer County jail, one of whom was an undercover agent who would pose as Howard-Rogers's uncle. The agent gave

Howard-Rogers a phone number at which to reach him. Howard-Rogers testified that he placed four phone calls to the number provided by the agent. Two of the calls involved only Howard-Rogers and the agent. During the other two calls, Howard-Rogers placed the call and then put defendant on the phone to speak with the agent. All four calls were placed by Howard-Rogers through his pre-paid phone account at the jail.

¶ 28    The State played a portion of State's exhibit No. 4, which was the first call Howard-Rogers made to the agent. Howard-Rogers identified the three voices heard in the recording as (1) himself, (2) the agent, and (3) defendant. Howard-Rogers testified that a short time later, he placed a second phone call (State's exhibit No. 5), which involved only himself and the agent. He made the second call because "[defendant] kept pressuring me to get in touch with [the agent]."

¶ 29    Howard-Rogers testified that between the first and second calls to the agent's phone (State's exhibit Nos. 4 and 5), he had discussions with defendant "about [whether the agent posing as Howard-Rogers's uncle was] going to get it done and how [defendant was] going to come up with the money."

¶ 30    Howard-Rogers testified that he placed a third call to the agent, which involved only himself and the agent. The State played a portion of that call, identified as State's exhibit No. 6.

¶ 31    The State then played a portion of the fourth phone call that Howard-Rogers placed to the agent, identified as State's exhibit No. 7. Howard-Rogers identified the voices as (1) himself, (2) the agent, and (3) defendant. Howard-Rogers then testified as follows in response to questions by the State :

"Q. And so during the process of these four phone calls taking place, did

- 6 -

[defendant] continue to ask about getting Ms. Lee taken care of?

A. Yes.

Q. Did he continue to have discussions with you about getting you what money you requested?

A. Yes.

Q. And at this point, did he indicate to you he wanted you to follow through with his request?

A. Yes."

¶ 32 On cross-examination, Howard-Rogers testified that he was in federal custody until 2031 and his request for early release had been denied.

¶ 33                                             2. *Meeghan Lee*

¶ 34 Meeghan Lee testified that she was currently an assistant state's attorney in Rock Island County but was previously the state's attorney of Mercer County. While she was employed in Mercer County, defendant "had been accused of several crimes," and she "was prosecuting" them.

¶ 35                                             3. *Tad Nelson*

¶ 36 Tad Nelson testified that he was employed by the Illinois State Police. In late August or early September 2021, he was contacted by Mercer County Sheriff Dusty Terrill regarding "a solicitation for murder plot." Based upon his conversation with Terrill, Nelson arranged with FBI agent Chad Hankins to interview Howard-Rogers. Nelson and Hankins interviewed Howard-Rogers at the United States Marshal's Office in Davenport. Following that interview, Nelson and his colleagues "decided to introduce an undercover agent to speak with [defendant]." They selected Derek Radosevich as the undercover agent.

¶ 37 Nelson and Hankins met with Howard-Rogers again, at which time they introduced Howard-Rogers to Radosevich, whose undercover name was "Ricky." At that meeting, the officers supplied Howard-Rogers with a phone number for "Ricky." Nelson testified that he never promised Howard-Rogers anything in exchange for his cooperation and emphasized, "We made that clear during the interview process."

¶ 38                                          4. *Chad Hankins*

¶ 39 Chad Hankins testified that he was a special agent employed by the FBI. Hankins participated with Nelson in the investigation into the "murder-for-hire plot." Hankins testified that he was asked about obtaining a "voice recognition expert." Hankins testified that although the FBI will perform voice analysis comparisons for use in developing investigative leads, such comparisons "[are] not appropriate for use in court." According to Hankins, "the recommendation from the FBI is that a person who's familiar with the speaker be questioned to identify if that is the speaker's voice or not."

¶ 40                                          5. *Justin Hartman*

¶ 41 Justin Hartman testified that he was the jail administrator at the Mercer County jail. As the jail administrator, he managed the day-to-day operations at the jail, including the jail phone system, which was purchased from a company named Securus. Hartman received training on the Securus operating system, which included a voice recognition component. In Hartman's experience, the voice recognition system was accurate. If it were to break or malfunction, Hartman would call Securus tech support to fix it.

¶ 42 Hartman also testified that the Mercer County jail housed inmates for the federal government. The federal inmates were able to intermingle with the county inmates. The jail was comprised of three "pods," which did not interact with one another. Each pod, however, housed

eight inmates that were released from their cells on a three-hour rotating basis. That is to say, the four inmates on the upper tier would be released for three hours while the four inmates on the lower tier would remain locked in their cells, and vice-versa. When released, the inmates would watch television or play games. For entertainment, the inmates had a tablet loaded with games, movies, and music.

¶ 43　　　　　Hartman testified that on August 30, 2021, both Howard-Rogers (who went by the nickname "JoJo") and defendant were inmates at the jail. On September 1, 2021, as Hartman was "doing rounds," Howard-Rogers, who was in his cell, said he "needed to switch out his uniform." When Hartman got close to Howard-Rogers, Howard-Rogers whispered that he needed to talk to him. Hartman brought Howard-Rogers out of the pod and into the booking room. Although the booking room conversation was audio and video recorded, the audio of Hartman's conversation with Howard-Rogers was extremely hard to hear due to background noise. The State introduced its exhibit No. 8, which was a video recording showing Hartman speaking with Howard-Rogers in the booking room.

¶ 44　　　　　After speaking with Howard-Rogers, Hartman reviewed surveillance video from C-Pod the previous day, showing Howard-Rogers and defendant sitting at a table. The video had no audio, which was standard practice at the jail.

¶ 45　　　　　Hartman testified that inmates could make phone calls from either (1) two phones located under the stairs in the pod or (2) their tablets. An inmate could make a call from inside his cell using the tablet, and there were no surveillance cameras in the cells.

¶ 46　　　　　Hartman testified that defendant had a phone account through Securus and he had used his account recently to place a call. Inmate phone calls were preserved during the normal course of business at the jail. The State played a recording of defendant's recent phone call for the

jury, marked as State's exhibit No. 10, and Hartman testified that he recognized the voice as belonging to defendant.

¶ 47    Hartman testified that Howard-Rogers also had a Securus phone account at the jail. On September 17, 2021, and September 27, 2021, calls were placed from Howard-Rogers's account to a phone number later identified as the phone number Radosevich gave Howard-Rogers to call, using a tablet. No video showed the calls being placed from inside the pod, and Hartman previously testified that the tablets could be used to place calls in areas with no surveillance coverage.

¶ 48    Hartman further testified that two more calls were placed to the same phone number on October 4, 2021. The first call that day was placed from a tablet. Hartman believed it was placed from inside a cell because there was no video of the call being placed. The second call that day was placed from a phone on the wall under the stairs, but Hartman was unable to obtain any video showing the call being made.

¶ 49    Hartman testified that he had spoken personally with both defendant and Howard-Rogers and was familiar with their voices. When asked if Hartman knew defendant to speak in different accents, Hartman answered, "He can have a German accent." Hartman also testified that the other inmates called defendant "the German."

¶ 50    The State then played a portion of State's exhibit No. 4, and Hartman identified the first voice as Howard-Rogers and the third voice as defendant. The State next played a portion of State's exhibit No. 7. Hartman again identified the first voice as Howard-Rogers, the second voice as someone he did not know, and the third voice as defendant.

¶ 51    On cross-examination, Hartman testified that the voice recognition component of the Securus system was "not accurate." The trial court admitted defendant's exhibit No. 1, which

was a report generated by the voice recognition component of the Securus system software pertaining to the October 4 phone call placed at 3:06 p.m. (State's exhibit No. 7). According to Hartman, the report had a "suspected index" number of 61, which indicated that "the phone call possibly could have came [*sic*] from or picked up another inmate's name besides [Howard-Rogers's]" and defendant's. (The "suspected index" number is further explained *infra* (¶¶ 54-58). We further note that this report was the document that caused the second mistrial when its existence was discovered mid-trial.)

¶ 52        On redirect examination, Hartman testified that, according to his training on the Securus system, the accuracy of the voice recognition system could be affected by an individual speaking in a disguised voice. Hartman believed the "suspected index" number of 61 pertained to Howard-Rogers, but he was not sure.

¶ 53                                  6. *Craig Charboneau*

¶ 54        Craig Charboneau testified that he was a field service manager for Securus. From August 2021 through October 2021, he was the "technological service" for the Mercer County jail's Securus account. During that timeframe, there were no issues with the Securus system that would have affected the accuracy of the phone calls. Charboneau testified about the voice recognition component of the Securus system, explaining that, as a call is placed, it "go[es] through" a data center located in Dallas where the calls are recorded and analyzed. When the call is completed, the software does a final analysis of the call and "kind of gives a range of who the possibilities the [voice on the] call could be." He said the analysis is "not an exact science, but it will give you a list of the top 10 and possible percentage of each one of those." He also said that the accuracy could be affected by someone trying to "muffle the microphone" or "change their voice."

¶ 55 On cross-examination, Charboneau testified that if an individual was attempting to cover the microphone or disguise his voice, the voice recognition system would not "pick [the wrong] person *** but it might lower the percentage." He explained, "So instead of saying it could be 80 percent this person, it might say 60 percent maybe that person."

¶ 56 Charboneau also testified about defendant's exhibit No. 1, which was a report generated by the Securus system. The report contained (1) the time the phone calls were made, (2) the length of the phone calls, (3) who made the calls, and (4) whether the person making the call was identified by a personal identification number (PIN) or voice biometrics. He explained that when a user enters a PIN at the beginning of the call, the system "tries to pick up, yes, that's [that user] making the phone call, but after the call is done is when [Securus] goes through and does its analytics and figures out who [was actually on the call]."

¶ 57 Regarding the October 4, 2021, call, Charboneau testified that the "61 percent" number on the report meant it was 61% likely that Howard-Rogers was on the call that was placed from his account. He further testified that the analytics were just a "tool." Thus, even if the voice analytics generated a result of 100% likelihood that a certain individual made a call, a deputy would still need to listen to the call or check the videotape to determine with certainty who made the call.

¶ 58 On redirect examination, the State asked whether the fact of two people engaging in the same phone call would affect the "suspected index" number. Charboneau explained that the system "tries to pick" whose voice is "prominently" on the call.

¶ 59 7. *Derek Radosevich*

¶ 60 Derek Radosevich testified that he had been a police officer for 16 years; during September and October 2021 (the relevant time period of the charged offense) he was employed

by the Milan Police Department. In mid-September 2021, he was contacted by the Illinois State Police regarding "a subject inside the Mercer County Jail that wanted to possibly have some people killed." Radosevich went to the jail with other officers and met with Howard-Rogers. Radosevich gave Howard-Rogers his phone number. The following day, September 17, 2021, Radosevich received a phone call from Howard-Rogers at the county jail. Howard-Rogers put another person on the call whose voice, at the time, Radosevich was unfamiliar with. The State played a recording of that phone call, identified as State's exhibit No. 4.

¶ 61　　　　Radosevich testified that on September 27, 2021, he received a second call from Howard-Rogers, which involved only Howard-Rogers and Radosevich. The State played a recording of that phone call, identified as State's exhibit No. 5.

¶ 62　　　　Radosevich further testified that he received two phone calls from Howard-Rogers on October 4, 2021. The State played both calls. The first call on October 4—State's exhibit No. 6—involved only Howard-Rogers and Radosevich. The second call that day—State's exhibit No. 7—involved Radosevich, Howard-Rogers, and the same third person that had participated in the first phone call in September. Radosevich testified that during the last phone call, the third person identified himself as "the German."

¶ 63　　　　On cross-examination, Radosevich testified that he never received any payment or instructions for payment. He also testified that he never offered Howard-Rogers anything in exchange for his cooperation.

¶ 64　　　　　　　　　　　8. *The Audio Recordings*

¶ 65　　　　　　　a. State's Exhibit No. 4—The September 17, 2021, Phone Call

¶ 66　　　　State's exhibit No 4. was a recording of a phone call, approximately seven minutes long, from the Mercer County jail. A pre-recorded female voice announced that the call was from

an inmate at the Mercer County jail and would be recorded, and it gave instructions for accepting the call. The recipient, whom both Howard-Rogers and Radosevich identified at trial as Radosevich, accepted the call and said, "Hello?" The person who placed the call, whom Howard-Rogers and Radosevich both identified at trial as Howard-Rogers, said, "What up Rock Island?" (We note that Howard-Rogers earlier testified that he called Radosevich "Rock Island.") After some very brief small talk, Howard-Rogers said, "Hold on."

¶ 67         A short pause ensued, during which Howard-Rogers audibly handed the phone to another person, who began speaking with Radosevich. (We note that (1) Howard-Rogers and Hartman identified this third person as defendant and (2) defendant denied that he was the third person.)

¶ 68         The third person greeted Radosevich, "Hey, what's up man, how you doing," and Radosevich answered, "Hey, what up." Radosevich asked, "So, what's going on," and the third voice answered, "Oh just sitting here, me and JoJo [(Howard-Rogers)] just here at the library looking at some books and stuff. That's what we're doing, how's your day going?" Radosevich answered, "Good man, just chilling." Additional small talk ensued, during which the third voice commented generally about life in jail and wanting to get home.

¶ 69         The following conversation (which we note comes from the recording itself played for the jury because no transcript was introduced at trial) then took place:

> "[RADOSEVICH]: I hear you're, uh, I hear you're looking for something
> man?
>
> [THIRD VOICE]: Yep, yep, yep, yep, yep. Looking for some time out.
>
> [RADOSEVICH]: Okay, so what's up, what's up with that then?
>
> [THIRD VOICE]: Oh, what's up with it, it's, it's whatever, ya know, just

not a whole lot (mumbling). Looking to get my trial done (mumbling).

[RADOSEVICH]: I hear you. I hear you.

[THIRD VOICE]: (unintelligible) trial (unintelligible) hasn't happened yet. (Unintelligible.)

[RADOSEVICH]: Yeah. So you trying to get out right?

[THIRD VOICE]: Yes, trying to get out of here, trying to get out. Trying to get out. (Mumbling.)

[RADOSEVICH]: Yeah, yeah, that's what I heard. So what's up, what's up then, if you don't want to (unintelligible)?

[THIRD VOICE]: Yeah, yeah, yeah. Yeah, I know that.

[RADOSEVICH]: I mean, I located your guy, I located your guy.

[THIRD VOICE]: Yeah, (mumbling) my lawyer he, he's gonna charge a bunch of money. Yeah.

[RADOSEVICH]: Yeah.

[THIRD VOICE]: I don't remember how much he was gonna charge, but yeah.

[RADOSEVICH]: Well, for me to do my job, man, it's gonna cost money, you know that.

[THIRD VOICE]: Yeah, yeah, yeah.

[RADOSEVICH]: So, you know, you know I don't know if JoJo told y'all what's up, but, ya know (mumbling) have to see some money first.

[THIRD VOICE]: Yeah, well, gotta get my lawyer, get that lawyer to come in here then I'll give you the money to give to him, you know.

[RADOSEVICH]: Okay.

[THIRD VOICE]: Gotta figure how much, how much he want from the retainer for it, ya know.

[RADOSEVICH]: Yeah.

[THIRD VOICE]: Figure out how to get the money to him. Because nobody else even wants to find a damn lawyer for me to get this lawsuit started and everyone else (unintelligible). They say he's a pretty good lawyer (unintelligible). But yeah.

[RADOSEVICH]: Yeah, he said about that lawyer. What's up with that female, too?

[THIRD VOICE]: Yeah, she's uh, she's, she's uh, staying positive. You know, she, she was, uh, a corrupt liar in court and everything, so she'll be included in the lawsuit. So, yeah. Get her in there too, get that lawsuit going and end this bullshit that they are trying to do to me and what they are posting online about me and all that shit.

[RADOSEVICH]: So, I'm trying to find her, she's kind of hard to find, man.

[THIRD VOICE]: Yeah, I don't know. (Mumbling.)

[RADOSEVICH]: Well, I found dude the other day. Followed him for a little bit.

[THIRD VOICE]: Yeah.

[RADOSEVICH]: So we got, we, we know where he at.

[THIRD VOICE]: Yeah. Cool. (Unintelligible) process server. (Unintelligible) yeah. And then he'll serve the papers. I think they all hang out

somewhere so they can't be served. You know he lives down there in Keithsburg, Illinois. He avoided, uh he avoided, uh, three subpoenas to come to court 'cause he wouldn't get served every time. (Unintelligible) Keithsburg, Illinois.

[RADOSEVICH]: Shit man. When do you think you gonna get that money then?

[THIRD VOICE]: Uh, should find out. Yeah, I can get the money sometime soon. I'll have to keep in touch with JoJo. But somebody else came in and now JoJo needs to talk to you. Here's JoJo."

Howard-Rogers then got back on the call with Radosevich and asked when he should call again. Radosevich answered, "Let him know hit me back when he thinks he's ready with that money." Radosevich and Howard-Rogers then ended the call.

¶ 70                     b. State's Exhibit No. 5—September 27, 2021

¶ 71            State's exhibit No. 5 was a recording of a phone call approximately one minute long placed by Howard-Rogers at the Mercer County jail to Radosevich. Howard-Rogers told Radosevich that defendant was pressuring him to call Radosevich to "see what's up." Radosevich answered that he was waiting to hear from defendant, adding, "I need to figure out what he actually wants." Radosevich stated, "Let him know, say you talked to your dude and he needs to know what's up, you can't be wasting his time, what exactly he wants done, you know what I mean." Howard-Rogers said he would have defendant call Radosevich the following day when they were "out to rec."

¶ 72                     c. State's Exhibit No. 6—October 4, 2021

¶ 73            State's exhibit No. 6 was a recording of a phone call approximately one minute long placed by Howard-Rogers at the Mercer County jail to Radosevich. Howard-Rogers told

- 17 -

Radosevich that he had been trying to get defendant to call, but defendant was "kind of worried about this phone." Radosevich said to tell defendant he had until Friday to call because Radosevich was not playing games.

¶ 74                                    d. State's Exhibit No. 7—October 4, 2021

¶ 75          State's exhibit No. 7 was an approximately four-minute-long recording. When Radosevich answered and asked who was calling, the same third voice from the September 17, 2021, call answered that it was "JoJo's buddy." (We note that the voice spoke with an obvious accent of some sort but consistent with a German accent.)

¶ 76          Radosevich said, "I need to know what's up with these people man. If you want 'em done, you want 'em done, you know what I mean?" The caller answered, "Just, uh, her first. She's the main one." Radosevich asked whether the caller wanted it "fully done or just hurt," and the caller answered, "Fully done." Radosevich asked, "You know what that means, right?" The caller answered, "Yeah. Yeah." Radosevich then confirmed, "You want her first?" The caller answered, "Yeah."

¶ 77          Radosevich then asked about the money, and the caller began rambling about Bitcoin and the difficulty with the volatility in its value. Radosevich said, "I just need that fucking cash" and noted that cash cannot be traced. The caller said he needed to figure out how to get payment to Radosevich.

¶ 78          Radosevich then told the caller that he could not keep "following her around," and the caller asked, "You found her?" Radosevich answered that he had indeed found her. The caller then stated, "Good, good. Uh. She gone, I'm out. Ya know. That's the biggest thing. The thing is, I'll give you money initially, I just don't know how to get it to you." Regarding payment, Radosevich answered, "Well I'm gonna tell you what man, we gotta figure it out soon. Ya know

- 18 -

what I mean? I don't just snatch the souls out of people and take their lives for no reason."

¶ 79        The caller then said he would "get with JoJo and figure out exactly how he can get it [(payment)] to you." Radosevich then cautioned about "bringing my boy JoJo into this shit" and gave the caller "72 hours to hit me back." The caller said, "Yes. I got it man, I got it." The call then ended.

¶ 80                                    e. State's Exhibit No. 10

¶ 81        State's exhibit No. 10 was a 31-second recording that the State offered as a known recording of defendant's voice. The call started with an automated voice stating, "This is a call from 'Kevin Hockenberry' [(a recording of defendant stating his own name)] an incarcerated individual at Mercer County jail." An unidentified female answered the phone and asked, "Hi, what'd you say your name was?" Defendant answered, "Hi, this is Kevin Hockenberry. How are you today?" The female responded, "Oh, hi Kevin." The State then ended the recording.

¶ 82                                    9. *Howard-Rogers Recalled*

¶ 83        The State recalled Howard-Rogers following Radosevich's testimony. The State played the entirety of State's exhibit No. 4, which was the September 17, 2021, phone call. Howard-Rogers identified the participants in the phone call as (1) himself, (2) Radosevich, and (3) defendant. The State then played the entirety of State's exhibit No. 7, which was the second October 4, 2021, phone call. Howard-Rogers identified the participants as (1) himself, (2) Radosevich, and (3) defendant.

¶ 84                                    10. *Defendant*

¶ 85        Defendant testified that he did not try to hire or solicit the murder of anyone. He stated that the third voice on the phone calls that were played for the jury was not his. Defendant stated that he (1) did not regularly interact with Howard-Rogers and (2) had his own tablet at the

jail. He stated that he did not have any ill will toward Lee and denied that he (1) was German, (2) spoke German, or (3) had ever been to Germany.

¶ 86        On cross-examination, the State asked defendant if he had ever had any disciplinary issues at the jail. Defense counsel objected to relevance, and the trial court answered, "Goes to his credibility. You opened the door." The following exchange then occurred between the State and defendant:

"Q. Have you ever had any disciplinary issues while at the Mercer County Jail?

A. I'm not sure. I don't recall.

Q. You don't recall if you've had any disciplinary issues?

A. I don't recall.

Q. What about allergies ***?

A. Yes, I do have allergies.

Q. You have allergies. Okay. What do those consist of?

A. Corn, tomatoes, and strawberries.

Q. And did you or did you not have a test, an allergy test, done recently?

A. Yes, I did.

Q. And what was the result of that?

A. I was never given the answer to it.

Q. Okay.

A. My medical records do show—that they were given to the sheriff's department from Genesis—show my allergies listed for lifetime are corn, tomatoes, and strawberries."

¶ 87    Defense counsel then objected to "any further questions about his health and allergies." The trial court again responded, "It goes to his credibility." However, the State had no further questions for defendant.

¶ 88                              11. *The State's Rebuttal Evidence*

¶ 89    The State called Hartman in rebuttal, and he testified as follows:

"Q.[D]uring the time that [defendant] has been with you [at the jail], have you had any issues in terms of [him] not telling the truth?

A. We've had some issues with some medical stuff.

Q. Could you tell me about that?

A. It was previously about three or four months after he got there, he stated that he was allergic to a few items.

Q. Did you attempt to accommodate that allergy?

A. We did.

Q. Could you tell me what you did?

A. He'd stated that he was allergic to corn, strawberries, and he was a vegan, could not eat eggs, any type of meat product.

Q. Were you ordering special food for [defendant]?

A. We were.

Q. And at some point in time did you become concerned that he was not telling you the truth?

A. Yes.

Q. Why?

A. He had supposedly an allergic reaction to one of his food trays. They

- 21 -

life-flighted him down to Peoria, which that emergency room—the doctor and nurse—pretty much said that was all false."

¶ 90 Defense counsel objected, arguing, "[I]f they want to provide a medical report or have that person come testify, but otherwise that is absolutely hearsay and should be stricken." The trial court overruled the objection, stating that (1) defendant opened the door about "his allergies" and (2) the testimony was not being offered for its truth but to impeach defendant's credibility.

¶ 91 The State continued its questioning of Hartman as follows:

"Q. And most recently did you have [defendant] again tested to confirm whether or not he had allergies?

A. Yeah. After that incident *** we started having doubt of his allergies, so our doctor ordered a blood test. I think it was ordered by the Court. And that all came back negative to what he had claimed.

Q. So he, in fact, did not have any allergies?

A. Correct."

¶ 92 Defense counsel then asked the following question of Hartman:

"Q. Were you provided the Genesis medical records for [defendant]?

A. They had shipped over—it was his intake of what he stated he was allergic to, is what they sent over, stating he was allergic to corn and a few other items."

¶ 93                          12. *Closing Arguments*

¶ 94 During closing argument, the State argued that the case "come[s] down to credibility" and stated as follows:

"Now, when determining credibility, you are going to be given a jury instruction on that. That jury instruction will indicate that only you are the judges of the believability of each witness, and you get to determine the weight that will be given to each of their testimonies. And in considering that and their testimony, you can take into consideration their ability to remember things, their opportunity to observe, manner while testifying. Any interests, bias, or prejudice anyone may have had. And the reasonableness of their testimony.

You will also be instructed that you are to consider the testimony of the defendant in the same manner that you listen to any of the State's witnesses."

¶ 95 The State then argued that defendant's testimony was not believable, asserting as follows:

"[Defendant] was asked yesterday if he had allergies. He even testified on the stand yesterday that he had allergies. He listed off more than a few for you. Allergies he has instantly [*sic*] said he's had since his arrival to the Mercer County Jail. Allergies that he claimed were so bad, he got life-flighted out of precautionary measures from the Mercer County Jail. And after that incident, it was confirmed that no allergies existed. Still testified to it in front of you guys. He persisted the allergies existed. Had to be court-ordered to confirm again that they didn't exist, the allergies he listed off under oath from yesterday.

If someone can commit to a story so overwhelmingly untrue, when will they tell the truth? That's for you to decide."

¶ 96 Defense counsel responded to the State's argument about defendant's allergies as follows:

"After all of this, all the money expended by the State bringing in these witnesses, their best argument is let's debate about a strawberry. Okay. Where is [*sic*] the medical reports that you're talking about? Where is [*sic*] any of these personnel that you are trying to discredit him with saying or showing any proof of that? They don't have any reports to give to you today. They didn't present them. But that doesn't really matter. Whether he's allergic to strawberries or not doesn't change what we're focusing on here, which is what you're being given, the jury instructions."

¶ 97 In rebuttal, the State stated as follows:

"Well, it wasn't a strawberry. It was strawberry, milk, and about five other things that [defendant] listed off in allergies. The demonstration of that is the lengths that [defendant] is willing to go. It demonstrates how driven [defendant] is in his motive and bias and prejudice that was demonstrated in front of you for his *** intent to have Ms. Lee murdered for $5,000."

¶ 98                               E. The Verdict and Sentence

¶ 99 The jury found defendant guilty.

¶ 100 In May 2023, the trial court sentenced defendant to 33 years in prison. Defendant did not file any posttrial motions.

¶ 101 This appeal followed.

¶ 102                                II. ANALYSIS

¶ 103 Defendant appeals, arguing that (1) the trial court erred when it allowed inadmissible hearsay statements relating to the results of defendant's food-allergy testing and (2) defense counsel rendered ineffective assistance by allowing the State to present other-crimes

- 24 -

evidence that defendant (a) solicited the murder of a second individual, which was not charged, and (b) was being prosecuted for several crimes at the time of the charged offense.

¶ 104 We disagree and affirm.

¶ 105 A. Defendant's Hearsay Claim

¶ 106 Defendant first argues that the trial court erred by permitting Hartman's hearsay testimony that (1) a doctor and nurse told Hartman that defendant's complaint of an allergic food reaction was false and (2) the results of defendant's blood testing for food allergies were negative. Defendant concedes that he failed to preserve this issue by raising it in a posttrial motion but contends that we should review his claim under the plain-error doctrine.

¶ 107 1. *The Applicable Law*

¶ 108 a. Plain Error

¶ 109 To preserve an error for review, a defendant must both object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. The failure to do either results in forfeiture. *Id.*

¶ 110 A reviewing court may consider a forfeited error under the plain-error doctrine when (1) a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 111 The defendant bears the burden of establishing plain error. *Id.* "If the defendant fails to meet his burden, the issue is forfeited, and [we] will honor the procedural default." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 75.

¶ 112                                    b. Hearsay

¶ 113          " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is not admissible unless it falls within a recognized exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, a statement is not barred by the prohibition against hearsay if the statement was not offered for its truth but for some other reason, such as to show the effect on the listener's mind or show why the listener undertook subsequent actions. *People. v. Price*, 2021 IL App (4th) 190043, ¶ 137.

¶ 114          A trial court's admission of hearsay testimony is reviewed for an abuse of discretion. *People v. Cross*, 2021 IL App (4th) 190114, ¶ 126. A court abuses its discretion if it acts arbitrarily, ignores recognized principles of law, or if no reasonable person would take the position adopted by the court. *Id.*

¶ 115                                   2. *This Case*

¶ 116                              a. Clear or Obvious Error

¶ 117          The first step in a plain-error analysis is to determine whether any clear or obvious error occurred. Accordingly, we first determine whether the trial court abused its discretion by allowing Hartman's testimony that (1) nurses and doctors treating defendant told Hartman that defendant's claims of food allergies were false and (2) defendant's court-ordered blood test showed that he had no allergies.

¶ 118          Defendant contends the above statements were inadmissible hearsay that did not fall within any recognized exception to the general prohibition against hearsay. The State responds that the trial court did not err because "defendant's credibility was at issue."

¶ 119          Although we agree with defendant that Hartman's testimony contained hearsay

statements, the trial court allowed Hartman's testimony about defendant's allergies for the purpose of impeaching defendant's credibility. Accordingly, we consider whether the trial court erred by admitting the statements for that purpose.

¶ 120     "Generally, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witnesses." *People v. Collins*, 106 Ill. 2d 237, 269 (1985). "However, the cross-examiner may not impeach a witness on a collateral matter; he must accept the witness' answer." *Id.* "The test to be applied in determining if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict." *Id.*

¶ 121     "Cross-examination should be limited to matters brought out on direct examination." *People v. Kirkwood*, 17 Ill. 2d 23, 30 (1959). Furthermore, "[i]t is improper to ask a witness questions on irrelevant matters on cross-examination for the purpose of contradicting his answers." *Id.*

¶ 122     Applying these principles, we conclude that the trial court erred by allowing the State to impeach defendant on a collateral matter. Defendant's food allergies were irrelevant to the case. Defendant did not testify about his allergies on direct examination but instead on cross-examination by the State. Accordingly, defendant did not "open the door" to the improper line of questioning, as the court determined when it overruled defendant's objection. Instead, the State went beyond the scope of the direct examination and introduced the topic of defendant's allergies so that it could call rebuttal witnesses to testify that defendant, indeed, did not have food allergies.

¶ 123     What occurred in this case is a classic example of impeachment on a collateral matter. The State misled the trial court by offering this evidence, and the court should never have

admitted it over defendant's objection.

¶ 124    Nonetheless, despite the error, there is no plain error because (1) the evidence was not closely balanced and (2) the error did not challenge the integrity of the judicial process.

¶ 125                    b. The Evidence Was Not Closely Balanced

¶ 126    When a defendant claims first-prong plain error, he must prove, in addition to a clear or obvious error, that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 26. When determining whether the evidence was so closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 127    Typically, the evidence is closely balanced if "the outcome of [the] case turned on how the finder of fact resolved a 'contest of credibility.' " *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A "contest of credibility" exists when (1) both sides present opposing versions of events and (2) there is no extrinsic evidence to corroborate or contradict either version. *Id*.

¶ 128    To be sure, the parties in the present case presented opposing versions of events— Hartman and Howard-Rogers testified that the third voice on the phone calls (in addition to Howard-Rogers and Radosevich) belonged to defendant while defendant testified that the voice was not his. If that was the extent of the evidence, this case might arguably be a "contest of credibility" because the jury would have to decide whom it believed based solely upon their testimony.

¶ 129    However, this case also involved extrinsic evidence that aided the jury in its determination—namely, the recordings of the phone calls. The jury did not have to resolve the

controversy simply by deciding whether it found Howard-Rogers and Hartman or defendant more credible. The jury was able to (1) listen to the voice soliciting Lee's murder on the phone calls, (2) compare that voice to (a) defendant's voice when he testified in open court and (b) the known recording of defendant's voice on the Securus system, and (3) decide for itself whether the voice soliciting Lee's murder belonged to defendant. That is to say, even if Howard-Rogers and Hartman had not testified *at all* that the voice belonged to defendant, the jury would have been able to decide defendant's guilt based solely on the audio recordings and defendant's testimony.

¶ 130    We also reject defendant's argument that the evidence was closely balanced because the first jury trial resulted in a hung jury. The mere fact that the first trial resulted in a hung jury after a mere hour and a half of deliberations tells us nothing about *why* that jury was deadlocked. See *People v. Smith*, 341 Ill. App. 3d 530, 543 (2003) ("Because it is unknown why the jury may have had difficulty reaching an agreement, we must view the evidence objectively to determine whether it was closely balanced.").

¶ 131    Having viewed the evidence objectively, we conclude that the evidence was not closely balanced and defendant has not shown first-prong plain error.

¶ 132    c. The Error Did Not Challenge the Integrity of the Judicial Process

¶ 133    When a defendant claims second-prong plain error, he must demonstrate, in addition to a clear or obvious error, that the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Moon*, 2022 IL 125959, ¶ 20.

¶ 134    The Illinois Supreme Court further explained second-prong plain error in *Moon*, 2022 IL 125959, ¶¶ 28-29, as follows:

> "In defining the second prong of the plain error rule, this court has equated

second prong plain error with structural error. [Citation.] An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence. [Citation.] In defining structural errors, the United States Supreme Court has explained that most constitutional errors can be harmless; if a defendant is represented by counsel and tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis. [Citation.] Therefore, the Supreme Court has applied harmless-error analysis to a wide array of constitutional errors [citation] and has recognized an error as structural, and subject to automatic reversal, only in a very limited class of cases. [Citation.]

The structural errors identified by the Supreme Court include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction. [Citation.] These errors affect the framework within which the trial proceeds, rather than mere errors in the trial process itself. [Citation.] Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence *** and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.).

See *People v. Ratliff*, 2024 IL 129356, ¶¶ 37, 38 ("[S]tructural errors [(1)] are a very narrow group that defies harmless error analysis" and [(2)] "deprive defendants of basic protections, such that their trials are not a reliable vehicle for determining guilt.").

¶ 135      Applying these principles, we conclude that defendant's claims of second-prong plain error—namely, the admission of improper hearsay for the purpose of impeachment on a collateral matter—are not structural errors or defects in the framework of defendant's trial, but instead mere errors in the trial process itself.

¶ 136      Defendant cites *People v. Jura*, 352 Ill. App. 3d 1080, 1093-94 (2004), *People v. Rivera*, 277 Ill. App. 3d 811, 823-24 (1996), and *People v. Virgin*, 302 Ill. App. 3d 438, 445 (1998). Each of these cases is factually distinguishable, and none provides support for the proposition that the admission of hearsay testimony through Hartman for the purpose of impeachment on a collateral matter constitutes structural error. Accordingly, defendant has failed to show second-prong plain error.

¶ 137                    B. Defendant's Ineffective Assistance Claim

¶ 138      Defendant also argues that defense counsel rendered ineffective assistance by allowing the State to present other-crimes evidence and subsequently failing to request a limiting instruction. Specifically, defendant asserts that his counsel allowed the State to introduce evidence from both Howard-Rogers and Radosevich that defendant solicited the murders of *two* individuals (Lee and Hartman) when he was charged with soliciting the murder of only *one* individual (Lee). Defendant also complains that his counsel allowed the State to elicit testimony from Lee that she had prosecuted defendant for "several crimes." Defendant asserts that his counsel's failure thereafter to request a limiting instruction enabled the jury to consider the aforementioned evidence for the improper purpose of showing defendant's propensity to commit crime.

¶ 139      The State responds that defendant fails to establish ineffective assistance because he has not shown (1) that his attorney performed deficiently or (2) that defendant was prejudiced by his attorney's performance. We agree with the State.

¶ 140                              1. *The Applicable Law*

¶ 141          "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Id.* (citing *Strickland*, 466 U.S. at 697).

¶ 142                                   2. *This Case*

¶ 143                        a. Defense Counsel Did Not Perform Deficiently

¶ 144          To satisfy the deficiency prong of the *Strickland* test, defendant "must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). "To establish deficiency, the defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *Id.*; see *People v. Jones*, 2023 IL 127810, ¶ 51 ("Matters of trial strategy are generally immune from ineffective assistance of counsel claims.").

¶ 145          The defense in this case was that defendant did not participate in the phone calls to Radosevich and, accordingly, did not solicit any murders at all. As a result, defense counsel's objective was to (1) discredit Howard-Rogers and (2) create reasonable doubt that the voice on the phone calls belonged to defendant. In this context, the number of targets is inconsequential; defendant's claim was that he did not solicit *any* murders. Although another attorney may have chosen to object to the testimony, an equally reasonable approach was to let it pass to avoid

- 32 -

drawing unwanted and unnecessary attention to an issue that was irrelevant to defendant's overall defense.

¶ 146        For the same reason, defense counsel's failure to object to Lee's testimony that she "was prosecuting" defendant for "several crimes" was a reasonable strategy. Lee's precise testimony was as follows:

> "Q. And through the course of your employment, did you have contact with [defendant]?
>
> A. I did.
>
> Q. And what was the reason for that contact?
>
> A. [Defendant] had been accused of several crimes.
>
> Q. And you were prosecuting those?
>
> A. I was prosecuting those, yes."

¶ 147        As it stands, the jury heard Lee's words only once. Had counsel objected and then requested a limiting instruction, the fact that defendant "had been accused of several crimes" would have become a focal point for the jury that it otherwise may have disregarded or even suspected on its  own given the nature of this case. See *People v. Evans*, 209 Ill. 2d 194, 221 (2004) ("It is highly possible that defense counsel allowed the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement.").

¶ 148        We also note that the trial court had granted the State's motion *in limine* to permit evidence that defendant was in custody on another pending criminal charge at the time of the offense. Defense counsel did not object, stating that it was "obvious where this incident allegedly took place." That is to say, defense counsel knew the jury would inevitably hear that his client was already in jail for another crime when he solicited Lee's murder. Under these circumstances,

counsel's decision not to draw attention to Lee's reference to "several" crimes was a reasonable, strategic decision.

¶ 149　　　　Moreover, Lee's testimony that she "was prosecuting" defendant for "several crimes" was relevant and admissible to defendant's motive to procure her murder, especially given the evidence on the phone recordings explaining that her death would result in defendant's release. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) ("Other-crimes evidence is admissible *** to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case.").

¶ 150　　　　For these reasons, we conclude that defense counsel did not perform deficiently by failing to object to the aforementioned evidence. However, even if we assumed, for argument's sake, that defense counsel's alleged errors were objectively unreasonable and deprived defendant of his right to counsel—which we emphasize, we do not—defendant was not prejudiced by counsel's performance.

¶ 151　　　　　b. Defendant Was Not Prejudiced by His Counsel's Performance

¶ 152　　　　To satisfy the prejudice prong of the *Strickland* test, defendant "must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Evans*, 186 Ill. 2d at 93.

¶ 153　　　　Defendant argues that "[b]ecause the jury's opinion of [defendant] was critical in reaching its verdict, counsel's failure to shield the jury from highly prejudicial evidence of other crimes created a reasonable probability that the result of the trial would have been different." Specifically, defendant claims that the case boiled down to his credibility and counsel's failure to object to the other-crimes evidence allowed the jury to find him guilty because it thought he was a bad person deserving of punishment. We disagree.

¶ 154 "While the erroneous admission of other-crimes evidence carries a high risk of prejudice and ordinarily calls for reversal [citation], the evidence must be so prejudicial as to deny the defendant a fair trial, *i.e.* it must have been a material factor in his conviction such that without the evidence the verdict likely would have been different." *People v. Cortes*, 181 Ill. 2d 249, 285 (1998). "If the error is unlikely to have influenced the jury, admission will not warrant reversal." *Id.*

¶ 155 As we explained *supra* (¶¶ 125-131), this case was not a closely balanced one that depended on defendant's credibility. To the contrary, the jury's decision whether the voice on the phone call soliciting murder belonged to defendant did not depend on defendant's credibility at all; the jury (1) listened to the voice on the recordings, (2) compared the voice on the recordings to defendant's voice when he testified, and (3) quickly determined that the voice on the recordings indeed belonged to defendant.

¶ 156 Accordingly, we reject the notion that the jury's verdict had anything at all to do with the admission of evidence that defendant solicited Hartman's murder as well as Lee's and that Lee was prosecuting defendant for several crimes. That is to say, if the jury believed the voice it heard on the recordings soliciting Lee's murder belonged to defendant—which it obviously did—it would find defendant guilty regardless of the evidence of Hartman's being a second target or Lee's fleeting statement that she had prosecuted defendant for "several crimes."

¶ 157 For these reasons, we conclude that defendant cannot show that either (1) his attorney performed deficiently or (2) he was prejudiced by his attorney's alleged errors. Defendant's ineffective assistance of counsel claim therefore fails.

¶ 158                                III. CONCLUSION

¶ 159 For the reasons stated, we affirm the judgment of the trial court.

¶ 160        Affirmed.